# COPY

FILED

2012 SEP 28  PM 11: 41

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  MICHAEL SCHLOSS, CA SBN 134124
2  schloss.michael@dol.gov
   SYMA AHMAD, MA SBN 674709
3  ahmad.syma@dol.gov
4  JEFFREY M. HAHN, DC SBN 975576
   hahn.jeffrey.m@dol.gov
5  Office of the Solicitor
6  Plan Benefits Security Division
   United States Department of Labor
7  P.O. Box 1914
8  Washington, DC  20013
9  Tel: (202) 693-5600; Fax: (202) 693-5610

10  Attorneys for Plaintiff HILDA L. SOLIS
11  Secretary of Labor, United States Department of Labor

12
          UNITED STATES DISTRICT COURT FOR THE
13
14          CENTRAL DISTRICT OF CALIFORNIA

15  **HILDA L. SOLIS,**                    )    **Civil Action No.**
16  Secretary of the United States          )    EDCV-1648- R| DTB
    Department of Labor,                    )
17                                          )
18                Plaintiff,                )
                                            )    **COMPLAINT FOR**
19        v.                                )    **ERISA VIOLATIONS**
                                            )    **(29 U.S.C. §§ 1001 et**
20                                          )    **seq.)**
21  **GREATBANC TRUST COMPANY,**            )
22  **SIERRA ALUMINUM COMPANY, and**        )
    **THE SIERRA ALUMINUM COMPANY**         )
23  **EMPLOYEE STOCK OWNERSHIP**            )
24  **PLAN**                                )
                Defendants.                 )
25  _____   )
26
          Plaintiff Hilda L. Solis, Secretary of the United States Department of
27
28  Labor (the "Secretary"), alleges:

---

**COMPLAINT FOR ERISA VIOLATIONS**                                    1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

1.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, et seq., and is brought by the Secretary to obtain relief under ERISA §§ 409 and 502(a)(2) & (5), 29 U.S.C. §§ 1109 and 1132(a)(2) & (5), to redress violations and enforce the provisions of Title I of ERISA.

2.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

3.     Venue with respect to this action lies in the United States District Court for the Central District of California, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Sierra Aluminum Company Employee Stock Ownership Plan (the "Plan" or "ESOP") is administered in Riverside, California, within this district, and the fiduciary breaches at issue took place within this district.

## PARTIES

4.     Plaintiff, the Secretary, is vested with authority to enforce the provisions of Title I of ERISA by, among other things, the filing and prosecution of claims against fiduciaries and other parties who commit violations of ERISA.  ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5).

5.      Defendant GreatBanc Trust Company ("GreatBanc") is an Illinois corporation with a principal place of business in Lisle, Illinois.  At all relevant times, GreatBanc was a full service trust company specializing in employee stock ownership plan oversight.  At all relevant times, GreatBanc was the Trustee of the ESOP.

6.      Defendant Sierra Aluminum Company ("Sierra Aluminum") is a California corporation with a principal place of business in Riverside, California.  At all relevant times, Sierra Aluminum produced extruded aluminum products.  At all relevant times, Sierra Aluminum was the sponsor of the ESOP.

7.      The ESOP is an employee benefit plan as defined by ERISA § 3(3), 29 U.S.C. § 1002(3), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).  The ESOP was established by Sierra Aluminum in 2000.  The ESOP is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

## INTRODUCTION

8.      The ERISA violations arise from GreatBanc's failure to protect the ESOP's interests in connection with the ESOP's purchase of Sierra Aluminum stock from the company's founders.  GreatBanc caused or

permitted the ESOP to buy the stock for more than its fair market value, without a proper valuation of the stock, and without prudently investigating the merits of the transaction on behalf of the ESOP.  In so doing, GreatBanc benefitted the sellers at the ESOP's expense and violated ERISA's prohibited transactions provisions and its duties of prudence, loyalty, and adherence to plan documents.

9.     GreatBanc and Sierra Aluminum also entered into indemnification agreements which are void under ERISA because they would permit Sierra Aluminum to pay GreatBanc's losses, costs, expenses, and damages from legal proceedings even if it violated ERISA, as long as the matter did not proceed to a final judgment from which no appeal could be taken.  As the 100% shareholder of Sierra Aluminum, the ESOP would be harmed if said indemnification agreements were enforced as written.

## GENERAL ALLEGATIONS

10.     The ESOP was adopted by Sierra Aluminum on March 31, 2001 with an effective date of April 1, 2000.  The ESOP is funded exclusively through employer contributions, as determined by Sierra Aluminum's Board of Directors, in the form of cash or Sierra Aluminum stock.  The ESOP currently owns 100% of Sierra Aluminum's stock.  It also invests a small

1   amount in interest-bearing cash accounts.  As of the fiscal plan year ending

2   on March 31, 2011, the ESOP had 322 participants with account balances.

3

4        11.    The Trust Agreement was also adopted on March 31, 2001 with

5   an effective date of April 1, 2000.  The 2000 Trust Agreement sets forth the

6

7   duties and responsibilities of the ESOP's Trustee.

8        12.    Pursuant to an Engagement Agreement dated April 1, 2005 by

9

10  and between LaSalle Bank and Sierra Aluminum, LaSalle Bank was

11  appointed the sole Trustee of the ESOP upon the resignation of the then

12  current Trustees.

13

14       13.    GreatBanc was appointed as the ESOP's successor Trustee,

15  effective as of October 31, 2005.  GreatBanc thereby assumed and became

16

17  vested with all of the powers, duties, privileges, discretions and obligations

18  that had been imposed upon or reserved to LaSalle Bank.

19

20       14.    Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), a person

21  acquires fiduciary status if he (i) exercises discretionary authority or control

22  over the management of a plan or exercises any authority or control over plan

23

24  assets  . . . or (iii) has discretionary authority or responsibility in the

25  administration of a plan.

26

27       15.    At all relevant times, GreatBanc was a fiduciary of the ESOP

28  pursuant to ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and

---

**COMPLAINT FOR ERISA VIOLATIONS**                                         5

(iii), by virtue of its authority as a successor Trustee to LaSalle Bank and the Board of Trustees.  As a fiduciary, GreatBanc is also a party in interest to the ESOP pursuant to ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

16.     Section 16(c) of the 2000 Plan Document sets forth the Trustee's powers and duties.  Among the enumerated powers is selecting an independent appraiser and determining the fair market value of Sierra Aluminum's stock as of such dates as the Board of Trustees determines to be necessary or appropriate.

17.     Section 5(a) of the 2000 Plan Document provides that "[a]ll purchases of Sierra Aluminum Stock by the Trustee shall be made only at prices which do not exceed the Fair Market Value as of the date of purchase." The 2000 Plan Document defines "Fair Market Value" as "[t]he fair market value of Sierra Aluminum Stock, as determined by the Trustee for all purposes under the Plan based upon a valuation by an independent appraiser (as defined in Section 401(a)(28)(C) of the Code) on an enterprise basis."

18.     Since its inception, the ESOP has engaged in three leveraged stock transactions to purchase shares of Sierra Aluminum stock from the family trusts of Sierra Aluminum's co-founders, William Hunter and Edmond Hudon: the Edmond A. Hudon Family Trust (the "Hudon Trust") and the 2002 William C. Hunter and Cynthia L. Hunter Revocable Trust (the "Hunter

Trust").  The first transaction took place on December 7, 2001 when the ESOP purchased shares of Sierra Aluminum's preferred and common stock for approximately $24 million (the "2001 Transaction").  The second transaction took place on October 19, 2005 when the ESOP purchased shares of common stock for approximately $21 million and became a majority shareholder of Sierra Aluminum (the "2005 Transaction").  The third and final transaction took place on June 20, 2006 when the ESOP purchased 3,402,337 shares of common stock for approximately $53 million (the "2006 Transaction").  The 2006 Transaction is the subject of this action.

19.     Prior to the 2006 Transaction, the ESOP owned 55.4% of Sierra Aluminum's common stock shares.  The remaining shares were owned by (a) the Hunter Trust, (b) the Hudon Trust, and (c) Edward Harris.

20.     At the time of the 2006 Transaction, Edward Harris, who is currently the President of Sierra Aluminum, controlled approximately 1% of the company's stock.  It was contemplated that his shares would be redeemed by the company in a subsequent transaction to close by August 2006.  After the consummation of the 2006 Transaction and following Sierra Aluminum's redemption of Harris' shares, the ESOP became the 100% shareholder of Sierra Aluminum.

21.　To fund the $53 million purchase price, the ESOP (a) borrowed $10 million in cash from Sierra Aluminum and (b) borrowed a combined total of $43 million in subordinated seller notes from the Hudon Trust and the Hunter Trust.

## ERISA VIOLATIONS

### The ESOP's June 20, 2006 Stock Purchase Transaction

22.　LaSalle Bank, the ESOP's Trustee prior to GreatBanc's appointment, was retained by Sierra Aluminum's Board of Directors to represent the interests of the selling shareholders, the Hunter Trust and the Hudon Trust, by analyzing and structuring a proposed deal whereby the shareholders would sell all of their remaining shares.

23.　On or about April 12, 2006, LaSalle Bank made a presentation to Sierra Aluminum's Board of Directors outlining a transaction whereby the Hunter Trust and the Hudon Trust would sell their combined 43.6% equity interest back to the company via a redemption and to the ESOP via a purchase for total consideration of $63.7 million.

24.　Also in mid-April 2006, Sierra Aluminum contacted a valuation firm (the "Appraiser") and requested a meeting to discuss the 2006 Transaction.  LaSalle Bank also attended this meeting and presented the

transaction's preliminary structure and a timeline for completing the stock purchase transaction.

25.     Following this meeting, GreatBanc and Sierra Aluminum retained the Appraiser to provide an analysis of the fair market value of Sierra Aluminum's common stock and an opinion as to whether the 2006 Transaction was fair to the ESOP from a financial point of view.

26.     The Appraiser had been previously retained by (a) the ESOP's Board of Trustees to provide a transaction-specific valuation opinion and fairness opinion in connection with the 2001 Transaction, and to provide annual valuation reports of Sierra Aluminum's common stock from 2001 through 2005, and (b) by GreatBanc to provide a transaction-specific valuation opinion for the 2005 Transaction and to provide annual valuation reports for each plan year since 2006.

27.     The Appraiser's Engagement Agreement was in a letter form dated April 21, 2006 and was sent from the Appraiser to GreatBanc.

28.     The Engagement Agreement defines the scope of the Appraiser's engagement as follows:

On behalf of the ESOP, you have requested that [the Appraiser] provide: (i) an analysis regarding the fair market value of the common stock of the Company as of a mutually agreeable current date

("Valuation Opinion"); and (ii) an opinion as to whether the Transaction is fair to the ESOP from a financial point of view ("Fairness Opinion"). We have been engaged solely for the purpose of preparing and delivering the Valuation Opinion and the Fairness Opinion. We will report solely to the Trustee notwithstanding the fact that the Company will pay all fees for our work.

29.     On or about April 21, 2006, LaSalle Bank made another presentation regarding the 2006 Transaction. In this presentation, LaSalle Bank again provided an overview of the proposed transaction, its preliminary structure, and described Hunter and Hudon's objectives to be the following: to achieve liquidity while Sierra Aluminum remained independent and employee owned, to provide a transaction structure that allows Sierra Aluminum the financial flexibility to fund its growth plan, to enable Sierra Aluminum and its shareholders to realize significant tax savings in the future through converting to a 100% S-corporation, and to construct seller notes to allow for a possible secondary sale to a third party. The Appraiser was provided with the April 21, 2006 presentation materials.

30.     On or about May 1, 2006, the Appraiser was again asked to attend another presentation by LaSalle Bank as they again discussed the structure of the proposed transaction. LaSalle Bank now increased its

valuation of the selling shareholders' interest from $63.7 million, which was the amount presented to the Board of Directors on April 12, 2006, to $67.6 million.

31.     In justifying its valuation, LaSalle Bank emphasized the tax benefits Sierra Aluminum would enjoy from its 100% ESOP-owned status and the fact that the sale transaction contemplated seller financing at interest rates allegedly far below market.

32.     LaSalle Bank also justified its May 1, 2006 valuation on an "unsolicited offer" made by Alcoa, Inc., a public company producer of primary aluminum, fabricated aluminum and alumina, to purchase Sierra Aluminum for $120 million.  However, Alcoa, Inc.'s offer was made in late 2000, nearly six years prior to the 2006 Transaction.

33.     The Appraiser provided GreatBanc two draft valuation reports and one final valuation report in connection with the 2006 Transaction as follows: (a) a draft report dated May 12, 2006 for a May 16, 2006 meeting of GreatBanc's internal ESOP Committee; (b) a draft report dated June 12, 2006 for a June 19, 2006 meeting of GreatBanc's internal ESOP Committee; and (c) a final report dated June 20, 2006.

34.     The May 12, 2006 draft valuation report sets forth the Appraiser's valuation of the sellers' share of Sierra Aluminum's common

stock as being in the range of $43.4 to $51 million.  The Appraiser's May 12, 2006 draft valuation report did not contain any reference to a valuation of the fair market value of the consideration or that the seller notes were being issued at "below-market" interest rates.

35.     Around this time, in mid-May 2006, the transaction's structure began to change.  Rather than considering how the transaction should be structured in order to best suit the ESOP's participants and beneficiaries, GreatBanc was interested in structuring the transaction to make it the most appealing to Hunter and Hudon, as evidenced by a May 16, 2006 email from E. Vaughn Gordy, GreatBanc's then-Senior Vice President, and current Chairman and CEO, to Edward Harris, Sierra Aluminum's current President, in which Gordy states as follows:

I wanted to throw out an additional possibility that might make this transaction more interesting to Ed [Hudon] and Bill [Hunter].  If instead of the company buying and retiring their stock, the ESOP buys all of the shares with the same seller financing, the 1042 tax deferral would be available to them.  This would enable them to defer capital gains tax and would increase their after tax proceeds.  Just a thought.

36.     On or about May 19, 2006, LaSalle Bank met with Sierra Aluminum's shareholders and set forth various alternative structures for

Hunter and Hudon to sell their ownership interests.  As described by LaSalle Bank in its May 19, 2006 presentation, Hunter and Hudon had become "uncomfortable" with the previously proposed transaction structure because of "tax penalties" related to the installment sales tax treatment of their seller notes, the long-term nature of leverage created by the seller notes, the minimal level of upfront proceeds, and the long-term nature of the warrants "beyond a time horizon for them to enjoy the potential economic upside from these securities."  For these reasons, rather than Hunter and Hudon selling their collective 43.6% equity interest to the company via a redemption, and to the ESOP via a purchase, the transaction evolved into Hunter and Hudon selling all of their outstanding shares directly to the ESOP.

37.    In late May 2006, after receiving the Appraiser's May 12, 2006 draft valuation report, GreatBanc directed the Appraiser to attend yet another presentation by LaSalle Bank.  GreatBanc asked the Appraiser to again listen as LaSalle Bank, the investment bankers tasked with looking after Hunter and Hudon's interests, discussed key points of their valuation and the proposed transaction.  The Appraiser participated in this meeting via conference call.

38.    After LaSalle Bank's presentation, the Appraiser ultimately agreed to reevaluate the financial value of the transaction and determine the fair market value of the consideration where the seller subordinated debt had

**COMPLAINT FOR ERISA VIOLATIONS**

allegedly "below-market" interest rates.  In its June 12, 2006 draft valuation report, the Appraiser valued the sellers' shares to be in the range of $40 to $47.3 million.  The Appraiser additionally set forth its valuation of the fair market value of the consideration, which was deemed to be in the range of $44.5 to $47 million.

39.     On June 19, 2006, GreatBanc's internal ESOP committee held a meeting.  Notes taken by committee members state that GreatBanc intended to "request [the Appraiser] add language reconciling the apparent $15/share price [the ESOP is] paying vs. actual value of the consideration we are surrendering."

40.     The next day, on June 20, 2006, the Appraiser issued its third and final valuation report, which sets forth its valuation of the seller's shares of Sierra Aluminum common stock, as of June 20, 2006 (the "Appraisal Report").  The Appraiser concluded that the seller's equity, based on a non-marketable minority interest basis, was in the range of $40.3 to $47.7 million, or $11.86 to $14.03 per share.  For reasons described in paragraphs 44 through 60 below, the Appraiser overestimated the value of the stock.

41.     Also on June 20, 2006, the Appraiser issued to GreatBanc its Fairness Opinion concluding the following:

On the basis of and subject to the foregoing and the attached report, as of June 20, 2006, (i) [*sic*] the Consideration with a face amount of $53,000,000, or approximately $15.58 per share, does not exceed the fair market value of the Shares as of the Closing Date; (B) the ESOP Note and the loan to the ESOP by the Company pursuant to the ESOP Loan and Pledge Agreement are at least as favorable to the ESOP as the terms of comparable loans resulting from arm's length negotiations between independent parties, and are for a reasonable rate of interest; and (C) the purchase and sale of the Shares, the terms of the ESOP Note, the terms of the ESOP Loan and Pledge Agreement, the exchange of the ESOP Note for the Exchange Notes, and the redemption of common stock of the Company and cancellation of options for such stock pursuant to the Stock Redemption Agreement, taken as a whole, are fair to the ESOP from a financial point of view.

42.     In forming its Fairness Opinion, the Appraiser relied upon its Valuation Opinion as contained in the June 20, 2006 Appraisal Report.

43.     The June 20, 2006 Appraisal Report concluded that the "face value" of the consideration the ESOP was proposing to pay the sellers was $53 million, or $15.58 per share. The Appraiser also found that the "fair market value" of the consideration, based on the "below-market" interest

rates on the seller notes in the combined total of $43 million, reduced the total value of the consideration to $44.7 to $47.1 million, or $13.12 to $13.86 per share.  Based on this information, the Appraiser opined that "[a]s the fair market value of the Consideration falls within the range of fair market value of the Shares, we determined that the Consideration does not exceed the fair market value of the Shares."

44.    In its Appraisal Report, the Appraiser unreasonably relied upon Sierra Aluminum's aggressive projections, which included a dramatic increase in total cash flows for fiscal years 2007 to 2011 that was unlike any performance Sierra Aluminum had generated in the seven years prior to the 2006 Transaction.  During fiscal years 2000 to 2006, Sierra Aluminum generated only $1.9 million in total cash flows after paying for capital expenditures.  Even after adding back the company's $5.5 million in total interest expenses during this time frame, as well as a portion of the company's ESOP expenses, Sierra Aluminum's total cash flows for fiscal years 2000 through 2006 is in the range of $7.4 and $25.6 million.

45.    In contrast to its historical performance, Sierra Aluminum forecasted that its future cash flows for the five years following the 2006 Transaction would total $60.3 million.  Despite the fact that Sierra Aluminum was forecasting earnings for a time frame two years shorter than its historical

benchmark (2000 to 2006 as compared to 2007 to 2011), it nevertheless forecasted a more than 50% increase in its total cash flows.  GreatBanc failed to engage in any independent exploration of the credibility of Sierra Aluminum's aggressive cash flow projections.

46.     The Appraisal Report also unreasonably relied upon Sierra Aluminum's projections with respect to acquiring a new piece of equipment. The Appraisal Report recognized that Sierra Aluminum was "operating at near capacity and running two shifts, six days a week.  Thus without additional capacity, Sierra Aluminum's growth is limited."  The Appraisal Report further details Sierra Aluminum's plans to acquire a new 14-inch press (to add to the company's 7-inch, 8-inch and 9-inch presses) within 18 months after the transaction.  Sierra Aluminum predicted that its sales would grow by $50.4 million from 2007 to 2011 and that this single piece of equipment was expected to account for 54% of such growth.  The remaining 46% increase was therefore expected to come from Sierra Aluminum's existing business at the time of the 2006 Transaction.

47.     The Appraisal Report acknowledges that the 14-inch press was expected to cost between $13 and $15 million, yet the company's projections failed to include any corresponding change in its expenses.  The acquisition of such new machinery would affect cash flows and specifically increase the

company's capital expenditures as reflected in its statement of cash flows.

However, the company's projections lack any increase in capital expenditures

that would reflect the acquisition of the 14-inch press.

48.     Sierra Aluminum unreasonably anticipated accounting for the

14-inch press as an operating lease rather than as a capital expenditure.  Even

assuming the validity of this assumption, Sierra Aluminum's projections still

failed to include any increase in its operating expenses.  Not only did the

company's projections for fiscal years 2007 to 2011 lacked any increase in

total operating expenses, but the company actually projected a *reduction* in

its total projected operating expenses.  The projections ranged only from $3

to $3.2 million, as compared with the company's 2006 levels of $3.8 million,

despite the *addition* of the new 14-inch press.

49.     Sierra Aluminum entered the 2006 Transaction with $3.8

million in adjusted operating expenses, projected it would incur an additional

$0.9 to $1.8 million in annual operating expenses in fiscal years 2008 to 2011

just from leasing the 14-inch press, and then, inexplicably, reduced its total

operating expenses to below its pre-2006 Transaction level in connection

with the ESOP's stock purchase.  Moreover, Sierra Aluminum's management

inexplicably forecasted *cutting in half* the operating expenses of its base

business, i.e. the company's existing business at the time of the 2006

**COMPLAINT FOR ERISA VIOLATIONS**

Transaction excluding any new business from the 14-inch press, while simultaneously projecting the company's dramatic growth. Again, GreatBanc never engaged in any independent exploration of the credibility of Sierra Aluminum's representations and projections.

50.    Sierra Aluminum's projections also forecasted that it would obtain a $0.30 gross margin per pound of aluminum shipped that was made by the 14-inch press for fiscal years 2008 through 2011. However, the historic range for these premiums was between $0.14 and $0.21 gross margin per pound. GreatBanc failed to question how Sierra Aluminum expected to obtain and sustain such a significant premium over time where it was wholly out of line and inconsistent with the market's historical performance.

51.    The Appraiser also made improper adjustments to Sierra Aluminum's cash flows by adding back ESOP expenses Sierra Aluminum incurred and failing to make any corresponding increase in employee compensation. The Appraiser's add-back erroneously implied that the ESOP was a gift. If the ESOP was not available to Sierra Aluminum's employees, then they would have needed to be compensated in some other form. GreatBanc failed to question or investigate how the Appraiser could add these expenses back without providing employees another benefit.

52.     The Appraisal Report further inappropriately used the adjusted levels of Sierra Aluminum's profits, including the ESOP expense add-back, and then compared these figures with market comparable companies but without making any similar adjustments to those companies' profits by adding back their pension and employee benefit expenses.  The Appraiser's comparison was flawed because the market comparable companies also had employee benefit plans and, presumably, similar expenses.  Therefore, only by making similar adjustments to the comparable companies could the Appraiser have made an "apples to apples" comparison with Sierra Aluminum's adjusted profit levels.  Again, GreatBanc failed to investigate the Appraiser's questionable comparison.

53.     The Appraiser also made improper adjustments to Sierra Aluminum's cash flows by adding back bonus expenses that were paid to Sierra Aluminum's co-founders and outgoing executives, Hunter and Hudon, because both would be retiring.  Based on Sierra Aluminum's own projections, it expected to achieve exceptional performance, so Hunter and Hudon's replacements likely would be compensated by receiving similar bonuses.  By adding back the historical bonus expenses, the Appraiser erroneously implied that similar expenses would not be incurred despite

Sierra Aluminum's projections of dramatic increases to its sales and total cash flows.

54.     Alternatively, by adding back the bonus payments, the Appraisal Report implied that these payments were not necessary in the first place and inappropriately were paid to Hunter and Hudon.  The Appraisal Report could not rationalize simultaneously adjusting Sierra Aluminum's income statement to add back the bonus payments *and* projecting that Sierra Aluminum would perform even better in the future without making similar payments to the executives who replaced Hunter and Hudon.  GreatBanc failed to probe the Appraiser as to its justification for the bonus add-back.

55.     The Appraisal Report also failed to take into account the possibility of a drop in aluminum prices, an increase in raw material costs or, at a minimum, a reversion to average prices.  At the time of the 2006 Transaction, Sierra Aluminum was operating at full capacity and enjoying unusually high aluminum prices.  However, the aluminum industry is known to be a cyclical business, and market analysts at the time were expecting aluminum prices to fall in the coming years.  The Appraisal Report should have considered these alternative scenarios.  Instead, the Appraiser projected that the company would enjoy the same favorable conditions for years and

extrapolated Sierra Aluminum's performance, at the peak of the aluminum cycle, in perpetuity.

56.    Finally, although the ESOP's price for the stock was $15.58 per share, and the Appraiser's estimated value of $11.86 to $14.03 per share was itself an overestimate, the Appraisal Report inappropriately relied on the purportedly "below market" interest rate on the ESOP's $43 million in loans to calculate that the "fair market value" of the consideration was $13.12 to $13.86 per share.

57.    As a result of the Appraisal Report's flaws and inaccuracies, the value set for Sierra Aluminum's stock as a whole and per share during the June 20, 2006 stock purchase transaction was far higher than its actual fair market value.  Therefore, the ESOP paid more than adequate consideration for Sierra Aluminum's stock.

58.    Based on the June 20, 2006 Appraisal Report, GreatBanc executed a shareholder consent on behalf of the ESOP and authorized the adoption of the Sierra Aluminum Board of Directors' actions and resolutions approving of the ESOP's purchase of common stock shares pursuant to the Stock Purchase Agreement, the Stock Redemption Agreement and ancillary agreements entered into in connection with the 2006 Transaction.

59.   The ESOP funded its June 20, 2006 stock purchase through three different loans.  First, the ESOP borrowed $10 million from Sierra Aluminum.  Second, the ESOP issued notes to the Hunter Trust and the Hudon Trust for a combined total of $43 million dollars.  Specifically, the Hunter Trust agreed to provide a loan to the ESOP with a face amount of $21,499,221.13 (the "Hunter ESOP Note") and the Hudon Trust agreed to provide a loan to the ESOP with a face amount of $21,500,778.87 (the "Hudon ESOP Note") (collectively, the "ESOP Notes").  For each loan, the ESOP agreed to pledge the proportionate number of common stock shares it purchased as security for repayment.

60.   GreatBanc's decision to purchase Sierra Aluminum's common stock from the Hunter and Hudon Trusts was imprudent and disloyal because the Appraiser's valuation of the stock was flawed and inaccurate, GreatBanc caused or permitted the ESOP to pay more than fair market value for the stock, and the ESOP's purchase violated the 2000 Plan Document, which required that the Trustee perform its duties under the Plan and the Trust Agreement solely in the interests of the Plan's participants and their beneficiaries and that all purchases of Sierra Aluminum stock by the Trustee be made only at prices which do not exceed the fair market value as of the date of purchase.

## The Indemnification Agreements

61.    The Engagement Agreement dated April 1, 2005, as amended

on September 26, 2012, the terms of which applied to LaSalle Bank as ESOP

Trustee and to GreatBanc as its successor, contains an indemnification

agreement, which provides as follows:

14.    Indemnification.  For purposes of this Section 14, the term

"Indemnitees" shall mean LaSalle and its officers, directors,

employees, and agents.  Subject to the applicable provisions of ERISA,

the Company shall indemnify the Indemnitees for any loss, cost,

expense or other damage, including attorney's fees, suffered by any of

the Indemnitees resulting from or incurred with respect to any legal

proceedings related in any way to the performance of services by any

one or more of the Indemnitees pursuant to this Agreement, the Plan or

the Trust.  The indemnification provided for in this Section 14 shall

include, but not be limited to: (a) any action taken or not taken by any

of the Indemnitees at the direction or request of the Company, any

agent of the Company, or any committee or fiduciary under the Plan or

Trust; and (b) all costs and expenses incurred by the Indemnitees in

enforcing the indemnification provisions of this Section 14, including

attorney's fees and court costs.  However, these indemnification

provisions shall not apply to the extent that any loss, cost, expense, or damage with respect to which any of the Indemnitees shall seek indemnification *is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken*, to have resulted either from the gross negligence or willful misconduct of one or more of the Indemnitees or from the violation or breach of any fiduciary duty imposed under ERISA on any one or more of the Indemnitees.  An Indemnitee who receives an advancement of fees or expenses from the Company pursuant to this paragraph shall make arrangements reasonably satisfactory to the Company to ensure that such Indemnitee will reimburse the Company for such advancements in the event it is determined the Indemnitee is not entitled to retain such amounts hereunder. (emphasis added)

62.     The 2000 Trust Agreement was amended contemporaneous with the Engagement Agreement on September 26, 2012 to incorporate the same indemnification agreement set forth above in paragraph 61.

63.     Pursuant to the terms of the indemnification agreements, Sierra Aluminum shall indemnify GreatBanc for any losses, costs, expenses, and damages GreatBanc incurs in connection with any legal proceeding relating to its services as the ESOP's Trustee, unless and until a court issues a final

1   unappealable judgment that GreatBanc breached its fiduciary duties under

2   ERISA or engaged in gross negligence or willful misconduct.

3

4   64.   If Sierra Aluminum paid all of GreatBanc's losses, costs,

5   expenses and damages in connection with this action, the value of the

6   company would be diminished, as would the value of the company's stock.

7   As the 100% shareholder of Sierra Aluminum stock, the ESOP would be

8

9   harmed if said indemnification agreements were enforced.

10

11   **FIRST CLAIM FOR RELIEF**
    **(Against Defendant GreatBanc for**

12   **June 20, 2006 ESOP Stock Purchase Transaction)**

13

14   65.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure,

15   the Secretary adopts and incorporates by reference the averments and

16   allegations of paragraphs 1 through 64 inclusive.

17

18   66.   As a fiduciary of the ESOP, Defendant GreatBanc has a duty to act

19   prudently and solely in the interests of the ESOP and its participants and

20

21   beneficiaries.  This duty includes the duty to thoroughly and objectively review

22   and analyze any valuation of Sierra Aluminum stock upon which the ESOP's

23

24   purchase price would be based.

25   67.   The June 20, 2006 Appraisal Report had significant flaws and

26

27   inaccuracies that would have been uncovered during a thorough and objective

28

review and analysis by a responsible ESOP fiduciary.  The Appraisal Report's flaws and inaccuracies include, but are not limited to, the following:

    (a)    Using aggressive and overly optimistic projections of Sierra Aluminum's future earnings and profitability;

    (b)    Failing to account for Sierra Aluminum's planned capital expenditures, including the purchase of expensive new machinery;

    (c)    Miscalculating Sierra Aluminum's operating expenses at the time of the 2006 Transaction and incorrectly analyzing how its projected new operating lease would impact its post-2006 Transaction operating expenses;

    (d)    Making improper adjustments to Sierra Aluminum's cash flows and failing to make any corresponding adjustments to the public companies used as comparables;

    (e)    Making improper adjustments to Sierra Aluminum's cash flows by adding back bonus expenses paid to outgoing executives despite projections of the company's dramatic future growth;

    (f)    Valuing the performance of Sierra Aluminum's business, which depends on a cyclical commodity, at the peak of its business cycle in perpetuity without any consideration of a drop in

aluminum prices or, at a minimum, a reversion to average prices;

(g) Inappropriately valuing the consideration not at the $15.58 per share price the ESOP paid but rather in the range of $13.12 to $13.86 based on the purportedly "below market" interest rate on the ESOP's $43 million in loans; and

(h) Erroneously concluding that the price the ESOP paid for Sierra Aluminum's stock did not exceed the fair market value of the stock.

68. Defendant GreatBanc failed to protect the ESOP and its participants and beneficiaries' interests by, among other things:

(a) Failing to investigate the credibility of comparing the consideration's fair market value, rather than its face value, with the fair market value of the purchased shares;

(b) Failing to investigate the credibility of Sierra Aluminum's aggressive and unrealistic projections of its future earnings and profitability;

(c) Failing to investigate the credibility of the assumptions, factual bases, and adjustments to financial statements that the Appraiser relied upon and made in preparing the Appraisal Report;

(d)   Failing to recognize the inconsistency between the company's historical operating expenses and the company's projected operating expenses on which the Appraiser's conclusions were based; and

(e)   Relying on the unsound Appraisal Report and improperly causing or permitting the ESOP to purchase Sierra Aluminum's stock from the Hunter Trust and the Hudon Trust at a price in excess of its fair market value.

69.   By its actions and failures to act as described above, Defendant GreatBanc:

(a)   failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

(b)   failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

1

(c)   failed to act in accordance with the documents and instruments

2

3

governing the Plan insofar as such documents and instruments

4

are consistent with ERISA, in violation of ERISA §

5

404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

6

7

(d)   caused the ESOP to engage in transactions that it knew or

8

should have known constituted the sale or exchange, or leasing,

9

of any property between the plan and parties in interest, in

10

11

violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A);

12

and

13

14

(e)   caused the ESOP to engage in transactions that that it knew or

15

should have known constituted direct or indirect transfers of the

16

17

ESOP's assets to, or use of the ESOP's assets by or for the

18

benefit of, parties in interest, in violation of ERISA §

19

406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

20

21

70.   As a result of the conduct as described above, Defendant

22

GreatBanc caused losses to the ESOP for which it is liable pursuant to

23

ERISA § 409(a), 29 U.S.C. § 1109(a).

24

25

26

27

28

**COMPLAINT FOR ERISA VIOLATIONS**

## SECOND CLAIM FOR RELIEF
### (Against Defendants GreatBanc and Sierra Aluminum for Indemnification Agreements Void Under ERISA § 410)

71.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 70 inclusive.

72.   By its terms, as set forth in paragraph 61 above, Sierra Aluminum's indemnification agreements with GreatBanc would require Sierra Aluminum to pay all of GreatBanc's losses, costs, expenses and damages incurred in connection with any legal proceeding relating to its performance as the ESOP's Trustee, unless and until a "court of competent jurisdiction, in a final judgment from which no appeal can be taken," finds that GreatBanc breached its fiduciary duty under ERISA.

73.   The indemnification agreements therefore purport to absolve GreatBanc from liability for fiduciary breaches arising under ERISA, unless and until a court issues a final unappealable judgment that GreatBanc violated ERISA.

74.   ERISA § 410(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under this part shall be void as against public policy[.]"  29 U.S.C. § 1110(a).

75.     As written, the indemnification agreements would permit Sierra Aluminum to pay GreatBanc's costs and expenses even if it violated ERISA, as long as this matter does not proceed to a final judgment.  As the 100% shareholder of Sierra Aluminum, the ESOP would be harmed if said indemnification agreements were enforced as written.

76.     By their actions as described above, Defendants GreatBanc and Sierra Aluminum entered into indemnification agreements that are void under the anti-exculpatory provisions set forth in ERISA § 410(a), 29 U.S.C. § 1110(a).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1.     Requiring GreatBanc Trust Company to restore all losses caused to the Sierra Aluminum Employee Stock Ownership Plan as a result of GreatBanc's fiduciary breaches, plus interest;

2.     Requiring GreatBanc Trust Company to return to Sierra Aluminum Company any funds it has received directly or indirectly in connection with any agreement or any provision of any agreement that grants or purports to grant GreatBanc Trust Company indemnification from Sierra

Aluminum Company or the Sierra Aluminum Employee Stock Ownership Plan, plus interest;

3.  Voiding any agreement or any provision of any agreement to the extent that it grants or purports to grant GreatBanc Trust Company indemnification from Sierra Aluminum Company or the Sierra Aluminum Employee Stock Ownership Plan and absolves GreatBanc Trust Company of liability for its fiduciary breaches under ERISA;

4.  Enjoining GreatBanc Trust Company from benefitting from any agreement or any provision of any agreement that grants or purports to grant it indemnification from Sierra Aluminum Company or the Sierra Aluminum Employee Stock Ownership Plan and absolves GreatBanc Trust Company of liability for its fiduciary breaches under ERISA, unless and until a court of competent jurisdiction, from which no appeal can be taken, finds that GreatBanc did not breach its fiduciary duties under ERISA;

5.  Enjoining Sierra Aluminum Company and the Sierra Aluminum Employee Stock Ownership Plan from indemnifying GreatBanc Trust Company for any liability for its fiduciary breaches under ERISA, unless and until a court of competent jurisdiction, from which no appeal can be taken, finds that GreatBanc did not breach its fiduciary duties under ERISA; and

6.  Granting such other relief as may be equitable, just and proper.

**COMPLAINT FOR ERISA VIOLATIONS**                                          33

1
2   Dated:   _9-27-2012_
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted:


For the Secretary:

M. PATRICIA SMITH
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor
Plan Benefits Security Division

RISA D. SANDLER
Counsel for Fiduciary Litigation

MICHAEL SCHLOSS
Counsel for Financial Litigation
CA SBN 134124
schloss.michael@dol.gov

SYMA AHMAD
Trial Attorney, MA SBN 674709
JEFFREY M. HAHN
Trial Attorney, DC SBN 975576
Office of the Solicitor
Plan Benefits Security Division
U.S. Department of Labor
P.O. Box 1914
Washington, DC  20013
Tel: (202) 693-5600
Fax: (202) 693-5610
ahmad.syma@dol.gov
hahn.jeffrey.m@dol.gov

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| HILDA L. SOLIS, Secretary of Labor, United States Department of Labor | GREATBANC TRUST COMPANY, SIERRA ALUMINUM COMPANY, and THE SIERRA ALUMINUM COMPANY EMPLOYEE STOCK OWNERSHIP PLAN |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Michael Schloss, Syma Ahmad, and Jeffrey M. Hahn U.S. Department of Labor, Office of the Solicitor, Plan Benefits Security Division, P.O. Box 1914, Washington DC 20013, (202) 693-5600 | Gregory Hansen, Case Lombardi & Pettit, 737 Bishop St., Ste 2600, Honolulu, HI 96813, (808) 547-5400; Laurence Goldberg, ESOP Law Group, LLP, 4 Embarcadero Center 14th Floor, San Francisco, CA 94111, (415) 766-3512 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes   ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violations of the provisions of Title I of ERISA, as amended, 29 USC Sections 1001 et. seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☑ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: ___ED CV12-1648___

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside County - Sierra Aluminum Company and Sierra Aluminum Company Employee Stock Ownership Plan | Illinois - GreatBanc Trust Company |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   9-27-2012

**Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

Name & Address:
Michael Schloss, Syma Ahmad & Jeffrey M. Hahn
U.S. Department of Labor, Office of the Solicitor
Plan Benefits Security Division
PO Box 1914
Washington DC 20013

◻ ORIGINAL

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

HILDA L. SOLIS, Secretary of Labor, United States
Department of Labor

PLAINTIFF(S)

v.

GREATBANC TRUST COMPANY,
SIERRA ALUMINUM COMPANY, and
THE SIERRA ALUMINUM COMPANY
EMPLOYEE STOCK OWNERSHIP
PLAN

DEFENDANT(S).

CASE NUMBER

EDCV12-1648-R (DTBx)

**SUMMONS**

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Syma Ahmad and Jeffrey M. Hahn_____, whose address is _U.S. Dept. of Labor, Office of the Solicitor, PBSD, PO Box 1914, Washington DC 20013_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **SEP 2 8 2012**

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Michael Schloss, Syma Ahmad & Jeffrey M. Hahn
U.S. Department of Labor, Office of the Solicitor
Plan Benefits Security Division
PO Box 1914
Washington DC 20013



# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| HILDA L. SOLIS, Secretary of Labor, United States Department of Labor<br><br>PLAINTIFF(S)<br><br>v.<br><br>**GREATBANC TRUST COMPANY, SIERRA ALUMINUM COMPANY, and THE SIERRA ALUMINUM COMPANY EMPLOYEE STOCK OWNERSHIP PLAN**<br>DEFENDANT(S). | CASE NUMBER<br><br>EDCV12-1648-R (DTB)<br><br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Syma Ahmad and Jeffrey M. Hahn_____, whose address is _U.S. Dept. of Labor, Office of the Solicitor, PBSD, PO Box 1914, Washington DC 20013_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:  SEP 2 8 2012

By:  **MARILYN DAVIS**

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is David T. Bristow.

The case number on all documents filed with the Court should read as follows:

### EDCV12- 1648 R (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.