Joseph C. Faucher (SBN 137353)
joe.faucher@dbr.com
Ryan R. Salsig (SBN 250830)
ryan.salsig@dbr.com
1800 Century Park East, Suite 1400
Los Angeles, California 90067
Tel:  310.203.4000; Fax:  310.229.1285

Theodore M. Becker (admitted pro hac vice)
theodore.becker@dbr.com
Julie A. Govreau (admitted pro hac vice)
julie.govreau@dbr.com
191 N. Wacker Drive, Suite 3700
Chicago, Illinois  60606
Tel: 312.569.1301; Fax:  312.569.3301

Attorneys for Defendant GreatBanc Trust Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HILDA L. SOLIS, Secretary of the United States Department of Labor,<br><br>                    Plaintiff,<br><br>          vs.<br><br>GREATBANC TRUST COMPANY, et al.,<br><br>                    Defendants. | Case No. EDCV12-1648-R (DTBx)<br><br>*Honorable Manuel L. Real*<br><br>**DEFENDANT GREATBANC TRUST COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br><u>Pre-Trial Conference:</u><br>DATE:  November 18, 2013<br>TIME:  11:00 a.m.<br><br><u>Trial</u>:<br>DATE:  December 3, 2013<br>TIME:  9:00 a.m. |

        Defendant GreatBanc Trust Company submits its Memorandum of

Contentions of Fact and Law in accordance with Local Rule 16-4.

DRINKER BIDDLE &
REATH, LLP

CH01/ 26262220.1

## I.    NATURE OF THE CASE

The Secretary of Labor ("Plaintiff") filed this action relating to a June 20, 2006 transaction (the "2006 Transaction") in which the Employee Stock Ownership Plan ("ESOP") of Sierra Aluminum Company ("Sierra") became 100% owner of Sierra. In the First Claim for Relief, Plaintiff claims that the ESOP Trustee, GreatBanc Trust Company ("GreatBanc") breached its fiduciary duty in connection with the 2006 Transaction.  In the Second Claim for Relief, Plaintiff asserted that the indemnification agreement between Sierra and GreatBanc was void under the Employee Retirement Income Security Act ("ERISA").  The Second Claim for Relief was dismissed by this Court on March 15, 2013.

The Plaintiff's only remaining claim is brought in hindsight.  Plaintiff, looking back after the near collapse of our financial system in 2009 and the ensuing Great Recession, is second-guessing a valuation by FMV Opinions, Inc. ("FMV"), an independent, reputable, highly qualified valuation firm with considerable experience in valuing ESOP companies and a deep knowledge of Sierra's business, Sierra's stock, and the consideration paid by the ESOP for the stock it purchased, and concluded the transaction was fair to the ESOP.  GreatBanc engaged in a reasonable and prudent process in reviewing FMV's conclusions.  That is all the law requires. *DeFazio v. Hollister, Inc.,* 854 F. Sup. 2d 770, 789-90 (E.D. Cal. April 5, 2012) citing to *Donovan v. Cunningham,* 716 F.2d 1455, 1467-68 (5th Cir. 1983) and *see Keach v. U.S. Trust Company,* 419 F.3d 626, 638 (7th Cir. 2005).

Although the value of Sierra's stock declined with the economy after the 2006 Transaction, Sierra has weathered the recession and has shown year-over-year profit since 2010.  No ESOP participants have complained about the 2006 Transaction, their interests in the ESOP, or the manner in which GreatBanc protected their rights and benefits.  Plaintiff merely takes issue with certain aspects of FMV's valuation report, but valuations experts seldom agree and this case is no exception.  That is why ERISA and the well-developed case law accords an independent ESOP Trustee like

GreatBanc broad discretion in reaching decisions based on a prudent process.  Only if the trustee abuses its discretion can it be liable for a breach of fiduciary duty.  Courts apply a deferential standard of review to decisions of independent ERISA fiduciaries reached through a prudent process.

Not surprisingly, Plaintiff has an "expert" witness who critiques FMV's 2006 valuation report and GreatBanc has an expert who supports FMV's valuation.  Among other shortcomings in Plaintiff's expert's analysis (1) he admittedly <u>did not</u> review any of the deposition testimony of either FMV's witnesses, or Sierra's management personnel, and therefore has ignored critical information regarding the FMV valuation report, and (2) he advocates using a valuation method (price to book value) that is generally considered not to be a reliable predictor of a company's value as a going concern.  The expert witness offered by GreatBanc will testify that FMV's valuation not only was reasonable, in many respects it was conservative. GreatBanc acted reasonably in relying upon the FMV valuation in approving the 2006 Transaction.

Neither GreatBanc nor its advisors were required to predict with precision the future course of Sierra's business.  Rather, they were required to conduct an investigation, the precise scope and nature of which depends upon the circumstances and the asset. *DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045, 1068 (E.D.CA 2009).  When an ESOP trustee engages the plan in a transaction, it is required to act with prudence and in the best interest of the participants in accordance with ERISA §404 and the transaction falls within the adequate consideration exemption of ERISA §408.  *Howard v. Shay,* 100 F. 3d 1484, 1488 (9th Cir. 1996) and *DeFazio,* 636 F. Supp. 2d at 1068.  Whether a particular transaction satisfies both ERISA §§404 and 408 depends on the conduct of the fiduciaries.  *Id.*  GreatBanc was obliged to conduct an intensive and scrupulous investigation of its options.  *Id.* and *see Henry v. Champlain Industries, Inc.,* 445 F.3d 610, 619 (2nd Cir. 2006). GreatBanc and its

advisors did, in fact, conduct an intensive and scrupulous investigation and fulfilled its duties to the ESOP and its participants and beneficiaries.

## II. BACKGROUND OF THE SIERRA ALUMINUM COMPANY ESOP

The ESOP was adopted by Sierra on March 31, 2001 with an effective date of April 1, 2000 and is a qualified employee stock ownership plan within the meaning of Internal Revenue Code § 2975(e)(7) and ERISA §407(d)(6).  At the time the ESOP was established, it acquired approximately 36% ownership of Sierra.  The initial transaction included a five-year option for the ESOP to acquire sufficient additional shares to have ownership control over the company.  A second transaction closed in October 2005 (the "2005 Transaction"), resulting in the ESOP owning approximately 55% of Sierra.  The third and final transaction, which is the subject of this lawsuit, closed on June 20, 2006 (the "2006 Transaction") and resulted in the ESOP owning 100% of the company.

Sierra is the sponsor of the ESOP, and an ESOP Committee comprised of four members appointed by the Board of Directors serves as plan administrator.  Initially, a group of four individuals served as ESOP trustee (the "Trustee Committee").  In anticipation of the 2005 Transaction, the Trustee Committee determined that there were potential conflicts of interest associated with the anticipated acquisition of additional Sierra stock by the ESOP, and therefore, an outside independent ESOP Trustee should replace the Trustee Committee.  The ESOP Committee interviewed a number of independent, institutional trustees and selected LaSalle Bank, N.A.'s trust department ("LaSalle Trust") to act as ESOP trustee.  At the time of the transaction, Vaughn Gordy, Kevin Kolb, Anne Umlauf, and Kathleen Ursa were part of the LaSalle Trust team servicing the Sierra ESOP.

The law firm of Case Lombardi & Pettit ("CLP") served as legal counsel to the ESOP since its inception and FMV served as financial advisor to the ESOP since its inception.  Based upon the extensive history and institutional knowledge that CLP and FMV already had with Sierra and the ESOP, and after conducting its own

evaluation of the work that CLP and FMV performed, LaSalle Trust engaged CLP and FMV as its advisors for the 2005 Transaction.

Extensive due diligence was conducted by LaSalle Trust, CLP and FMV before LaSalle Trust approved the 2005 Transaction. FMV was expected to, and did, continue to serve as financial advisor to the ESOP and conduct the annual valuation of stock after the closing of the 2005 Transaction.

Also in October 2005, GreatBanc acquired LaSalle Bank, N.A.'s trust practice. The LaSalle Trust employees who had worked on the 2005 Transaction and serviced the Sierra ESOP transferred to GreatBanc between October 31, 2005 and January 1, 2006. Sierra's Board of Directors transferred trustee services for the ESOP to GreatBanc and GreatBanc became the successor trustee of the Sierra ESOP. The same employees who had serviced the Sierra ESOP at LaSalle Trust continued to service the Sierra ESOP at GreatBanc.

In March 2006, Vaughn Gordon contacted Greg Hansen of CLP and advised him that the remaining shareholders and founders of Sierra, William Hunter and Edmond Hudon (the "Sellers"), had engaged Bank of America to assist them in finding a market buyer for their remaining shares. The Sellers also consulted with LaSalle Corporate Finance who proposed a redemption transaction whereby Sierra would purchase the Sellers' remaining shares. GreatBanc engaged CLP and FMV to advise it regarding the 2006 Transaction. In addition to the historical experience FMV had with the ESOP, FMV was on GreatBanc's approved list of valuation advisors. Thus, the team of advisors involved in the 2006 Transaction were very knowledgeable about the business and financial condition of Sierra and its ESOP.

As originally proposed, the 2006 Transaction would not involve the ESOP purchasing stock from any party. Rather, a redemption transaction was contemplated in which Sierra would purchase all the outstanding stock. GreatBanc's duty simply would be to monitor the transaction so that the price paid by Sierra would be fair and not unreasonably dilutive to the ESOP. On April 12, 2006, Vaughn Gordy and Kevin

Kolb of GreatBanc and John Ashbrook, Alan Siposs, and David Eckstein of FMV, reviewed a presentation that LaSalle Corporate Finance made to the Company and Sellers on April 11, 2006 regarding the proposed transaction. GreatBanc and its advisors believed that the LaSalle Corporate Finance proposal would result in a transaction occurring at a price in excess of fair market value, which might unreasonably dilute the value of the ESOP's shares. GreatBanc expressed concern that such a transaction could force GreatBanc, as Plan Trustee, to consider a derivative action to protect the interests of the ESOP. FMV was instructed by GreatBanc to conduct its valuation as soon as possible and CLP was instructed to research fiduciary duties involved with a possible redemption in excess of fair market value. Around this time, Vaughn Gordy, the primary representative of GreatBanc for the proposed transaction, requested Jim Staruck, a GreatBanc employee and former corporate attorney, to assist in the transaction, and, in particular, to review transaction documents.

On May 1, 2006, GreatBanc, represented by Vaughn Gordy and Jim Staruck, CLP, represented by Greg Hansen, and FMV, represented by David Eckstein, John Ashbrook, and Alan Siposs, met with LaSalle Corporate Finance, represented by Joe Barbour, Greg Fresh, and Mary Josepha, and counsel for Sierra, represented by Marc Baluda and Larry Goldberg, in San Francisco. During this meeting, LaSalle Corporate Finance maintained that the shares to be sold had a value of approximately $67 million. FMV valued the shares between $49 and $55 million. During this meeting, it was revealed to GreatBanc that the proposed transaction structure had changed because Sierra could not redeem shares for a price in excess of $40 million based upon California Corporations Code Section 500. GreatBanc and its advisors were also told by Marc Baluda that the Sellers had decided against pursuing an outside buyer and, thus, the proposed restructured redemption transaction would include approximately 5% warrants for the Sellers and 10% stock appreciation rights

for key management personnel, and the ESOP would be purchasing some of the shares.

During this meeting, representatives of GreatBanc and CLP expressed to LaSalle Corporate Finance and to Mr. Baluda and Mr. Goldberg, numerous concerns about the proposed restructured redemption transaction, including (a) possible dilution to the ESOP if the redemption were to occur at a price greater than the value determined by FMV; (b) possible problem with a redemption by Sierra at a price higher than the price the ESOP would be willing to pay for its shares; and (c) possible problems with the transaction occurring at a "control price." GreatBanc and FMV determined that the difference between the respective valuations of LaSalle Corporate Finance and FMV occurred because LaSalle Corporate Finance relied on market comparable companies that FMV did not view as appropriate comparables, and because LaSalle Corporate Finance calculated a value premised upon the 100% ESOP/S Corporation tax benefit, which cannot be taken into consideration under ERISA. Due to concerns over the proposed structure and difference in valuations between FMV and LaSalle Corporate Finance, GreatBanc and CLP advised LaSalle Corporate Finance and counsel that GreatBanc may be forced to take derivative action against Sierra if the transaction were to proceed as currently structured.

To protect the interests of the ESOP participants and beneficiaries, GreatBanc directed FMV and CLP to engage in further diligence and investigation regarding the two-price structure of the proposed redemption transaction, to confirm amendment to ESOP plan documents to provide for S-corporation language, dilution to the shares held by the ESOP due to the warrants and stock appreciation rights, the effect of shareholders agreements, and the company's repurchase liability.

After CLP advised GreatBanc concerning the business judgment rule and the degree of protection that the Sierra Board of Directors could expect by authorizing the purchase of shares at a price greater than the market value determined by FMV, GreatBanc engaged another attorney with expertise, David Ackerman, to advise it on

CH01/ 26262220.1

the business judgment rule/dual price transaction and control price issues involved in the proposed transaction.

On May 16, 2006, GreatBanc submitted comments to all parties on the first round of draft documents prepared by Sierra's counsel.  On May 16, GreatBanc's Fiduciary Committee (the "Fiduciary Committee"), comprised of Karen Bonn, Marilyn Marchetti, John Marino, Vaughn Gordy, Greg Beard, Jim Staruck, Kevin Kolb, Anne Umlauf, Kathleen Ursa, and Steve Hartman[1], convened with CLP, represented by Greg Hansen, David Ackerman, and David Eckstein and John Ashbrook of FMV in attendance.  The Fiduciary Committee engaged in an extensive review of the proposed transaction and FMV's valuation analysis, which then estimated a range of $43.3 - $51 million for the Sellers' remaining shares.  Committee Member Marilyn Marchetti challenged the appropriateness of valuing the Sellers' remaining shares on a "control" basis where the ESOP already owned a majority of the outstanding Sierra stock.

---

[1] Members of GreatBanc's Fiduciary Committee were highly educated individuals with extensive experience in ESOP transactional work, collectively. Committee members who reviewed the 2006 Transaction include:  Anne Umlauf, graduate of the University of Michigan with an MBA from the University of Detroit and 20 years of institutional trust services experience; Kevin Kolb, graduate of Indiana University with a J.D. and an LL.M. in Employee Benefits from John Marshall Law School who has served as trustees' representative in over 100 ESOP transactions; John Marino, graduate of New York Institute of Technology with a Masters degree in International Management with a Specialization in Finance and Trade with over 20 years of experience in employee benefit plan design, administration and compliance; James Staruck, graduate of the University of Illinois, with an MBA and a J.D. from DePaul University with a background in qualified plans, debt and equity finance and general corporate law; Vaughn Gordy, graduate of Pennsylvania State University with an MBA from Northwestern University with over 20 years of experience in ESOP transactions for both closely held and publicly traded companies; Karen Bonn, former Senior Vice President of the ESOP Services Group of GreatBanc and National Director of ESOP services at BDO Seidman, LLP; Marilyn Marchetti, J.D. former Senior Vice President of the ESOP Services Group of GreatBanc, with over 30 years of experience in ESOP transactional work as an attorney and as a trustee, including frequent speaking engagements relating to fiduciary duties and ESOPs; and Steve Hartman, graduate of Bucknell University and the National Graduate Trust School, with over 30 years of experience in over 200 ESOP transactions.

CH01/ 26262220.1

During the meeting, one of GreatBanc's attorneys, David Ackerman explained that in some cases an ESOP trustee may reasonably approve a redemption where the sale price is higher than fair market value; however, the business judgment rule would protect the corporation's directors only where the Board of Directors is not conflicted.  Mr. Ackerman explained further that because the Sierra Board was comprised of two selling shareholders and three insiders who would likely receive stock appreciation rights in connection with the transaction, the Sierra Board may not be able to rely on the business judgment rule, and GreatBanc might be obligated to raise an objection based on corporate waste. If the Board, nevertheless, chose to proceed with the transaction, GreatBanc might then be obligated to pursue a derivative action on behalf of the ESOP.

Following the meeting, Vaughn Gordy contacted Edward Harris at Sierra and suggested that if the ESOP purchased all of the outstanding shares, the Sellers could make an election under Internal Revenue Code Section 1042 which would allow them to defer capital gains tax on the sale and, thus, realize a greater return on the sale of their shares, even less favorable terms.

During mid-May, negotiations between GreatBanc and the Sellers continued, and GreatBanc informed the Sellers that the ESOP could not proceed with the transaction at a purchase price of more than $50 million. This upset the Sellers and Edward Harris, who was expected to take over leadership of Sierra, threatened to resign.

On June 1, 2006, GreatBanc, represented by Vaughn Gordy and Jim Staruck, FMV, represented by David Eckstein and John Ashbrook, CLP represented by Greg Hansen, and David Ackerman, had a conference with LaSalle Corporate Finance, represented by Greg Fresh and Mary Joseph, their outside valuation expert, Robert Socol of Stout Risius Ross, and counsel Marc Baluda and Larry Goldberg.  LaSalle Corporate Finance explained that the Sellers had instructed them to find a third-party buyer for the company, but LaSalle Corporate Finance had talked them into makin

one more attempt to do a deal with the ESOP.  Ultimately, the Sellers agreed to a 1042 exchange with Seller notes at below-market interest and without warrants.  Based on this restructured transaction and up-to-date financials, FMV determined that a transaction price of $53 million was fair to the ESOP and FMV prepared a final Appraisal Report and Fairness Opinion that the fair market value of the consideration given by the ESOP ($10 Million Cash, plus $43 Million in notes issued to the Sellers), was within the range of the fair market value of the Seller's remaining shares, because the terms of the notes – including below market interest rates and generous payment holidays – were highly favorable to the ESOP. On June 19, 2006, GreatBanc's Fiduciary Committee met to discuss the merits of the restructured transaction and to assess FMV's valuation and fairness opinion.[2]

As restructured and approved by GreatBanc's Fiduciary Committee, the transaction closed on June 20, 2006.

## III.   KEY LEGAL ISSUES AND EVIDENCE AS TO PLAINTIFF'S CLAIMS

Plaintiff's First (and only remaining) Claim for Relief can be broken down into three broad alleged violations of ERISA.  Plaintiff should not prevail on the First Claim for Relief for the reasons set forth below.

### A.   The Evidence Will Show That GreatBanc Satisfied The Exclusive Benefit Rule and the Prudent Man Rule.

To prevail on the breach of fiduciary duty claims pursuant to ERISA §404(a), the Plaintiff must prove that GreatBanc (1) failed to act solely in the interest of

_____

[2] The ESOP entered into three notes – (1) a $10 million note with Sierra, (2) a $21,499,221.13 note with the William C. Hunter and Cynthia L. Hunter Revocable Trust (the "Hunter ESOP Note") and (3) a $21,500,778.87 note with the Edmon A. Hudon Family Trust (the "Hudon ESOP Note").  The Hunter ESOP Note and the Hudon ESOP Note were for 20-year terms at 4.79% annual interest.  The Hunter ESOP Note and the Hudon ESOP Note were exchanged by Sierra for the same face value, but with 10-year repayment terms, variable rates of interest (Libor plus 2%) and two payment holidays exercisable by Sierra (the "Exchange Notes.")

participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration (the "exclusive benefit" rule; (2) failed to use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use (the "prudent man" rule); and (3) that failed to follow the ESOP's documents and instruments. In analyzing the first of these two claims, the law provides that the court must consider *not* whether the outcome of the transaction was positive, but whether GreatBanc engaged in a prudent process in deciding whether the ESOP should enter into the 2006 Transaction.

1.   GreatBanc Engaged In a Prudent Process, and in Doing So, Satisfied The Exclusive Benefit Rule and the Prudent Man Rule.

Fiduciaries are obligated to engage in an intensive and scrupulous independent investigation of their options prior to approving a transaction. *DeFazio,* 854 F. Supp. 2d at 789.  The scope and nature of the investigation depends upon the circumstances surrounding the transaction and the consideration.  *Id.*  Fiduciaries can show that they fulfilled their fiduciary obligation to the plan by whoing that they determined fair market value based upon a prudent investigation of the circumstances *then prevailing.  Id.* at 789-790, citing to *Cunningham,* 716 F.2d at 1467-68.  Whether GreatBanc properly discharged its fiduciary duties under ERISA is determined on the basis of facts and circumstances arising *at the time of the transaction.  Henry v. Champlaign Enterprises, Inc.,* 445 F.3d 610 (2d Cir. 2006) (emphasis, added).  In reviewing whether a trustee acted prudently, the volume of notes taken and memos written is not determinative.  *Id.*  What matters is what the trustee did at the time of the transaction.  In *Henry,* the court of appeals found that despite a lack of notes, there was ample evidence the trustee (1) reviewed the valuation report, (2) met with the financial adviser to discuss its concerns, (3) met with company management, and (4) confirmed that the valuation report was revised to reflect its concerns.  *Id.*

The 2006 Transaction was thoroughly vetted and documented by GreatBanc and its advisors.  Here, GreatBanc will present extensive notes, memoranda and emails demonstrating that GreatBanc engaged in a prudent process. The process consisted of (1) vetting and retaining advisors who were already experienced with Sierra and its ESOP, and knowledgeable regarding Sierra's financial history and forecasted earnings; (2) reviewing information provided by Sierra's management and financial advisors; (3) aggressively negotiating the transaction in a manner that not only resulted in the ESOP obtaining 100% ownership of Sierra, but also resulted in tax advantages for Sierra; (4) negotiating terms of financing from the Sellers that were at below-market interest rates with payment holidays that Sierra was able to – and did – take advantage of during the recession; (5) negotiating the removal of warrants that the Sellers' advisors initially proposed that would have resulted in the Sellers maintaining a means of control over the company after the sale of their shares, and; (6) a tax-advantaged 1042 exchange for the Sellers that provided an incentive for the Sellers to sell their shares in exchange for below-market notes.  In short, GreatBanc negotiated a transaction that benefitted the ESOP.[3]

Plaintiff also apparently contends that FMV was not an "independent appraiser" as required by ERISA § 408(b)(17) and the Tax Reform Act of 1986 and, correspondingly, Plaintiff also implies that GreatBanc acted inappropriately in relying on FMV and violated the exclusive benefit rule and/or the prudent man rule.

---

[3]   The Plaintiff seems to believe that because Mr. Gordy suggested that the Sellers consider a Section 1042 transaction GreatBanc somehow did not act for the exclusive benefit of the ESOP participants and beneficiaries.  That is simply not the case.  The law does not hold that a transaction which has some incidental tax benefits for sellers is commensurately unfair to an ESOP. (*See, e.g., Hans v. Tharaldson,* 2011 WL 7179644 at *7 (D.N.D. 2011), citing *Reich v. Compton,* 57 F.3d 270 (3rd Cir. 1995) [requiring proof of a subjective intent to benefit a party in interest, and finding insufficient a transaction that simply "has the effect of benefitting" a party in interest]. Indeed, the tax-related benefits that the sellers here might realize made it possible for the ESOP to obtain the Sellers' shares via consideration with notes with an interest rate that was significantly below the prevailing market rate at the time of the transaction and on other terms highly favorable to the ESOP and the company that the ESOP came to fully own as a result of the 2006 Transaction.

This contention rests solely on the fact that during the course of its due diligence, FMV received information from and met with Sellers' representatives, and directly questioned representatives of LaSalle Corporate Finance, the Sellers' financial advisor. In conducting due diligence for any transaction, however, GreatBanc works with its financial advisor to investigate the financial condition of the company. Where the company has retained its own financial advisors, it is basic due diligence to meet with and question these advisors to determine their views on value in an attempt to gather as much financial information as may be available. According to FMV, the only thing unusual about meeting with the Sellers' financial advisors in the 2006 Transaction was that the Sellers had such sophisticated information available. Because the information was available, FMV was happy to access it. Indeed, it is FMV's standard practice to seek all relevant information from all parties. At no time did the Sellers or Sierra believe that GreatBanc had any duty other than to the ESOP. FMV never felt pressured by GreatBanc to accept the value presented by the Sellers – indeed, it did not. Had representatives of FMV not received information from the Sellers' advisors, Plaintiff likely would be complaining about that.

> 2. <u>GreatBanc acted in accordance with the documents and instruments governing the ESOP.</u>

Plaintiff alleges that GreatBanc violated the terms of the ESOP by permitting the ESOP to purchase stock at a price in excess of fair market value as provided in Section 5(a) of the ESOP document. As set forth in detail below in Section B, however, the price that the ESOP's paid for the Sellers' stock was within the range of fair market value as determined by the ESOP trustee's independent financial advisor.

> **B. The Evidence Does Not Support The Claim that GreatBanc Caused the ESOP to Engage in a Prohibited Transaction in Violation of ERISA §§ 406(a)(1)(A) and (a)(1)(D).**

ERISA §§ 406(a)(1)(A) and (a)(1)(D) prohibit a fiduciary from causing a plan to engage in a transaction that constitutes a direct or indirect sale or exchange of any

property between the plan and a party in interest or the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.  The Plaintiff has alleged that the June 2006 Transaction was a prohibited transaction.

Plaintiff acknowledges, however, that ERISA §408 specifically *exempts* transactions of the type that occurred in the 2006 Transaction.  Specifically, ERISA §408 provides an exemption to the general prohibition of the acquisition or sale of qualifying employer securities by an ESOP if, among other conditions, the acquisition or sale is for adequate consideration and any loan relating to a sale is at a reasonable rate of interest.

1.   The ESOP Did Not Pay More Than Adequate Consideration for the Stock it Purchased.

The ESOP paid no more than adequate consideration for the stock it purchased in June 2006, and the adequate consideration paid was determined in good faith by GreatBanc.  *See, Eyler v. Commissioner of Internal Revenue,* 88 F.3d at 454-455. Adequate consideration is defined by ERISA §3(18) as the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan.  In analyzing whether a trustee of an ESOP approved the purchase of stock for adequate consideration, as in analyzing whether a fiduciary breached its duty, a court looks to the *process* that the trustee undertook in approving the value of the consideration.  *Id. DeFazio,* 636 F. Supp. 2d at 1068; and *see Howard,* 100 F.3d at 1488.  Good faith requires that the trustee of a plan uses a prudent method of determining value. *Cosgrove v. Circle K Corp.,* 915 F. Supp. 1050, 1064 (D. Ariz. 1995), *aff'd,* 107 F.3d 877 (9th Cir. 1997).

No one individual at GreatBanc has authority to approve an ESOP transaction or valuation.  Rather, GreatBanc has a Fiduciary Committee and its members are responsible for evaluating the information gathered by GreatBanc's advisors and determining whether a proposed transaction is in the best interest of ESOP participants.  In 2006, fourteen GreatBanc employees served on the Fiduciary

Committee – all Fiduciary Committee members were experienced ESOP service providers.  Fiduciary Committee meetings were *ad hoc*, the Fiduciary Committee would hold as many meetings as necessary when considering a transaction or valuation.  Not all Fiduciary Committee members were expected or required to attend every Fiduciary Committee meeting.  Among Committee members for the 2006 Transaction were Anne Umlauf, who holds an MBA; Kevin Kolb, who holds a J.D. and an LL.M. in Employee Benefits; John Marino, who holds a Masters degree in International Management with a Specialization in Finance and Trade; James Staruck, who holds an MBA and a J.D.; and Vaughn Gordy, who holds an MBA.  In addition to education in business, financem, mergers, and qualified retirement plans, GreatBanc's Fiduciary Committee members collectively had over 50 years of experience with ESOP transactions.

The Fiduciary Committee members are expected to come to Fiduciary Committee deliberations fully prepared.  GreatBanc requires that draft valuation reports and due diligence memos be provided to the Fiduciary Committee at least 48 hours in advance of a meeting.  Fiduciary Committee members are expected to review the draft valuation report and legal due diligence memo before stepping into the meeting.  Fiduciary Committee members are expected to assess the valuation report and come prepared with questions.  Fiduciary Committee members are not expected to agree with or disagree with any particular statement in a valuation report. If a Fiduciary Committee member disagrees with a certain statement in a draft valuation report, it is expected that the statement will be challenged and requested to be redrafted based on the facts elicited during Fiduciary Committee deliberations.

FMV conducted the primary due diligence investigation as to the financial condition of Sierra, including assessing the reasonableness of the company's projections regarding its future bsiness.  GreatBanc Fiduciary Committee members Vaughn Gordy, Kevin Kolb, and Anne Umlauf had prior experience with Sierra and had recently participated in extensive due diligence in connection with the 2005

Transaction.  Vaughn Gordy regularly communicated with Sierra's President, Edward Harris, and had visited Sierra's facilities, touring the plant.  FMV's diligence included meeting and interviewing company management, reviewing past valuation reports, assessing the reasonablness of projections provided by Sierra's management against historical financial information, considering appropriate comparable companies, and analyzing the data gathered.   It is not unusual for FMV to meet with advisors hired by other parties to a transaction, as it can be helpful to see other perspectives, even if ultimately FMV does not agree with the other advirors' analyses.

Following initial diligence, FMV prepared a draft appraisal report which it presented at the May 16, 2006 meeting of GreatBanc's Fiduciary Committee.  During the Fiduciary Committee meeting, FMV led the group through its draft report and compared it with the presentation prepared by LaSalle Corporate Finance.  FMV went through its valuation approach and methodologies, including comparable companies and multiples used.  FMV also reviewed its discounted cash flow model analysis, explaining how adjustments were made.  In analyzing projected company expenses, FMV backed out executive bonuses going forward on the assumption that the Sellers, who were the Company founders, would no longer be involved in the day-to-day operations at the company and, therefore, the substantial bonuses that the Sellers had received would not be paid to successor management.[4]  FMV's approach regarding the bonuses were consistent with Vaughn Gordy's understanding that current management was adequately compensated.  Sierra's management did anticipate implementing a stock appreciation rights program for senior management, and that program was accounted for in FMV's analysis.  During this meeting, various assumptions that FMV used were challenged by membes of GreatBanc's Fiduciary

---

[4] The Plaintiff does not seek to impose any liability on GreatBanc or anyone else in this litigation in connection with Sierra's past payment of bonuses to the selling shareholders.

CH01/ 26262220.1

Committee.

Following its further due diligence review, FMV prepared a 33-page Appraisal Report with six appendices and 23 supporting exhibits setting forth its analysis and conclusions. This report was provided to GreatBanc in advance of its June 19, 2006 Fiduciary Committee meeting.  FMV first concluded that the fair market value of the Sierra common stock was within a range of $11.86 to $14.03 per share.

One of Plaintiff's claims in this matter is that FMV should have blindly assumed that the fair market value of the notes that were issued to the Sellers (the "Notes") was equal to their face value ($43 Million).  Plaintiff contends, in effect, that GreatBanc should have insisted that FMV not even consider whether the fair market value of those Notes might have been more or less than their face value.

Where the consideration paid for the stock being purchased by an ESOP includes rates at below market and other favorable terms, it is apprpriate to determine whether the notes are worth some amount other than the principal amount.  In this transaction, since the consideration being provided to the Sellers was something other than exclusively cash, it was entirely necessary and appropriate to determine the actual fair market value of the Notes.  Those Notes provided to the Sellers for their stock had certain characteristics which affected their fair market value.  In particular, the interest rate payable on the Notes was well below the 11-15% market yields on comparable subordinated notes in the marketplace at that time.  The Notes, moreover, contained payment holidays which required the Sellers to accept a 12-month period in which no payments of principal would be made.  During the payment holiday period, the interest rate would be reduced, with the reduction added to the principal balance when payments resumed.[5]

---

[5] Plaintiff's own expert witness testified at his deposition "I don't know" when asked if a third party buyer would have accepted the notes issued to the Sellers in connection with the 2006 Transaction. The true answer, of course, is that no buyer would have accepted those notes, at their face value because the interest rate payable on the notes was substantially below market.

FMV believed it was appropriate to take into account the value of the consideration (the Notes) in its analysis in determining whether or not the transaction was fair to the ESOP.  FMV concluded that while the $43 million *face value* of the Notes plus the $10 million in cash being paid for the Sellers' stock was $15.58 per share ($53 million), the *fair market value* of the Notes and cash was in the range of $13.12 to $13.86 per share.

At the June 19, 2006 GreatBanc Fiduciary Committee meeting, FMV again walked the Committee through the revised valuation report, explaining the two primary changes in the report: (1) that it was prepared on a minority, non-marketable interest basis and (2) that FMV considered the market value of the Notes rather than simply their face value.  FMV justified a reduction in the minority interest discount based on the Sellers' rights to put their shares back to the Company at a control price over a 10-year period.  FMV then walked the Committee through exhibits to the report, including its analysis of the fair market value of the consideration. GreatBanc's Fiduciary Committee members and GreatBanc's advisors discussed this at length.  They scrutinized FMV's analysis in valuing the Notes, including FMV's determination that the interest rates of comparable subordinated notes in the marketplace ranged from 11-13%.  However, the interest rate of the Notes in this transaction were substantially lower.  The Fiduciary Committee asked FMV to add language in the valuation report and fairness opinion letter explaining the methodology used in valuing the Notes, and only then did GreatBanc's Fiduciary Committee unanimously approve the 2006 Transaction.

GreatBanc believed in 2006 and continues to believe today that the valuation approach used by FMV was sound. GreatBanc will present testimony from an acknowledged and highly experienced ESOP valuation expert – Richard May – supporting that conclusion.  Mr. May will testify in support of three broad conclusions. Those conclusions are:

1.  The ESOP did not pay more than fair market value for the Shares in the 2006 Transaction;

2.  The FMV Report relied upon appropriate valuation methodologies, and implemented them in a careful and appropriate manner such that the FMV Report's overall opinion on the range of fair market value for the Shares was a reasonable basis for the 2006 Transaction, and;

3.  The FMV Report and its results were reasonable and appropriate for GBT to rely upon.

The Plaintiff recklessly has accused GreatBanc of manipulating the value of the consideration for the 2006 Transaction as compared to the 2001 and 2005 Transactions.  The 2001 and 2005 Transactions, however, were financed with senior debt from Bank of America, not subordinated seller financing.  The Sellers, moreover, initially demanded that they be issued warrants in connection with the 2006 Transaction *in addition to* the Notes to compensate them for the below market interest rate of the subordinated ntoes.  Ultimately, as a result of GreatBanc's negotiation on behalf of the ESOP, no warrants were issued to the Sellers.

Unable to dispute that the subordinated Notes were at below-market interest rates, the Plaintiff instead engages in Monday-morning quarterbacking, challenging the projections and assumptions that FMV considered in preparing its Appraisal Report.  For example, Plaintiff contends that FMV improperly relied on optomistic company forecasts. Mr. May will testify that FMV's approach in calculating Sierra's future cash flows was proper and conservative. Mr. May also will testify that the discount rate applied to calculate future cash flows was reasonable and conservative (it led to a lower value than could have been reasonably justified), and appropriately took into account the risks specific to Sierra's business.[6]

---

[6] Plaintiff's own expert proposed applying a much higher "idiosyncratic risk" factor to Sierra than FMV applied or Mr. May believed appropriate. Plaintiff's expert has simply plucked his proposed figure out of thin air. Whether his approach is justifiable or not, however, is beside the point. A valuation firm's application of "idiosyncratic

The Plaintiff also contends that FMV's projections did not adequately account for capacity constraints and that FMV unreasonably relied on Sierra's projections that contemplated acquiring a 14-inch press.  FMV's projections, however, were consistent with Sierra's existing capacity and ability to expand its existing capacity. Historically, Sierra had continually grown its business, even when operating at near capacity.  As explained by Sierra's president, Ed Harris, adjustments could be made to schedules, production and other variables to increase capacity.  The 14-inch press was but one alternative to increasing capacity.  Sierra had a history of working through its capacity constraints, and FMV had every reason to believe that they could continue to do so in the future.

Plaintiff's assertions that projected expenses were too low and projected margins were too high are informed by their hindsight knowledge that the 14-inch press which FMV had intended to purchase and install pre-recession, ultimately was not purchased.  In reviewing projected expenses and projections *at the time of the transaction,* however EBIT margins were well within the range of adjusted actual historical EBIT margins.  Projections of future gross profits were in line with the company's actual recent performance in 2006.  Sierra did not project higher overall gross profit margins.

The Plaintiff also contends that FMV made improper adjustments to Sierra's cash flow and earnings, including improperly adding back ESOP expenses and bonuses.  The ESOP expense had historically been beyond normal levels and were non-cash benefits – ESOP expenses were returned to Sierra as repayments of principal and interset on the ESOP notes, resulting in a zero net cash flow.  FMV's treatment in adding back the ESOP expense was correct.[7]  The bonus add-back, as

---

risk" to a company in determining the discount rate to be applied to future cash flows is in essence a "judgment call," as is much of valuation practice. To suggest that GreatBanc or any reasonable fiduciary would be in a position to second-guess the FMV's assumptions in this regard is simply not appropriate or realistic.

[7] Plaintiff's expert devotes substantial space in his initial report to a suggestion that,

explained above, was reasonable based on the fact that the Sellers would no longer be receiving bonuses and existing management was not expected to receive bonuses at those levels. Plaintiff's expert disagrees, but failed to take into account the deposition testimony that supports FMV's and GreatBanc's reasonable assumption that the significant bonuses the Sellers had been receiving would not be paid to Sierra management going forward.

FMV and GreatBanc reported in interviews with the Department of Labor and in depositions that this was a transaction that entailed careful due diligence. The documents generated during the lead-up to the 2006 Transaction confirm this. There were numerous discussions with Sierra's management and numerous discussions with GreatBanc about particular issues that arose during the two-month process leading up to the closing of the 2006 Transaction. FMV and GreatBanc believed then, as they believe today, that the process was careful and thorough, the result was positive for the ESOP and the company, and the deal was done well.

2.    The Notes Between the ESOP, Company and Selling Shareholders were at Reasonable Rates of Interest.

The prohibited transaction exemption of ERISA §408(b) requires that loans taken out by an ESOP plan to acquire employer securities must be (A)… primarily for the benefit of participants and beneficiaries of the plan, and (B)…at an interest rate which is not in excess of a reasonable rate. Regulations provide that at the time the loan is made, "the interest rate for the loan and the price of securities to be acquired with the loan proceeds should not be such that plan assets might be drained off." 29 C.F.R. § 2550.408b-3(c)(2). Regulations further provide that whether or not the loan is between independent parties, the loan must be at least as favorable to the

_____

perhaps, it *might not* have been appropriate to add those expenses back. Ultimately, he himself added back those expenses for purpose of his own analysis. This pattern of criticizing certain techniques – yet ultimately embracing them himself – permeates much of the report of Plaintiff's expert.

ESOP as the terms of a comparable loan resulting from an arm's-length negotiation between independent parties.  29 C.F.R. § 2550.408b-3(c)(3).

There can be no question, as described above, that the ESOP notes were heavily negotiated and were on terms highly favorable to the ESOP, in particular, at below-market interest rates for comparable instruments.

Cases and regulations recognize the fair market value of a promissory note may differ from its face. Estate tax regulations defining fair market value refer to specific rules for valuing bonds and notes.  For bonds that are not publicly traded, the fair market value is determined based upon the "soundness of the security, the interest yield, the date of maturity, and other relevant factors."  26 C.F.R. § 20.2031-2(f).  For notes, fair market value is less than the face amount if the evidence shows that the fair market value is less because of the interest rate, date of maturity, or other cause.  26 C.F.R. § 20.2031-4.

In *Hans v. Tharaldson,* Case No. 5-cv-115-RRE in the United States District Court for the District of North Dakota, the valuation expert retained by the ESOP's independent fiduciary determined that fair market value of the notes used to finance the ESOP's acquisition of stock was less than face value and that the ESOP did not pay more than fair market value for the stock.  The court rejected the plaintiff's contention that the fair market value of the notes could not be considered in evaluating whether the ESOP paid more than adequate consideration.  "Plaintiffs' assertion that the court must only look at the fair market value of the stocks when determining whether there was 'adequate consideration' for the transaction isolates half of the transactional equation.  In order to determine whether there was 'adequate consideration' for the purchase, one must look at the fair market value of the asset being sold in relation to the price paid by the purchaser…" *Hans v. Tharaldson,* 2011 WL 7179644, *9 (D.N.D. Oct. 31, 2011).

Indeed, the Department of Labor's own participant loan regulatons provide that loans are considered to bear a reasonable rate of interest if the loan provides the

plan with a return commensurate with the interest rates charged by persons in the business of lending money for loans which would be made under similar circumstances.  29 C.F.R. §2550.408b-1(e).

The Notes in the 2006 Transaction were not cash and were not cash equivalents.  Because they were not cash or cash equivalents, they had to be valued. ERISA §408(a) recognizes that a reviewing fiduciary in an ESOP transaction must ascertain the value being paid.  When an ESOP trustee has a choice between two loans that contain identical terms except for their interest rates, the loans with the lower interest rate will cost the borrower less.  FMV's value of the consideration for the Seller's stock purchased by the ESOP took into account only the below-market interest rates.  The Notes, however, also included payment holidays which allowed the company to extend the terms of the loan and further defer interest payments which would have made the Notes worth even less than the value FMV assigned to them.  GreatBanc and FMV actually took a conservative approach to the valuation of consideration for the the 2006 Transaction.

## C.    GreatBanc did not cause any loss to the ESOP.

ERISA §409(a) provides, in part,

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary.

Even if the Plaintiff could establish that GreatBanc breached its fiduciary duty to the ESOP and/or caused the ESOP to engage in a prohibited transaction, neither of which the Plaintiff can establish, the Plaintiff has failed to offer evidence that the ESOP has suffered any losses as a result of the 2006 Transaction.

The payment holidays and below-market interest rates of the Notes, negotiated by GreatBanc as part of the 2006 Transaction, permitted Sierra to weather challenging economic times during the Great Recession that followed.  As 100% owner of Sierra, the ESOP benefitted from those concessions.  In 2009, the value of Sierra's stock was less than $1.00 per share.  The stock valuation for the plan year ending March 31, 2013 was $9.50 per share.

If Plaintiff cannot show that the ESOP suffered losses, there can be no recovery against GreatBanc.  *See DeFazio v. Hollister, Inc.,* 2012 U.S. Dist. LEXIS 49063 (E.D. Cal. April 6, 2012) (Although court found fiduciaries breached duty to ESOP by failing to undertake investigation of fair market value of stock, because plaintiff could not show that the book value of stock was less than the fair market value, there were no damages.)

Additionally, courts have held that even where a trustee fails to act prudently, the trustee is insulated from liability under ERISA §409(a) if a "hypothetical prudent fiduciary would have made the same decision anyway."  *Plasterers' Local Union No. 96 Pension Plan, et al. v. Pepper,* 663 F.3d, 210, 218 (4th Cir. 2011); *Tatum v. R.J. Reynolds Tobacco Company,* 55 EBC 1227, 1252 (D. N.C. February 25, 2013).  As the *Tatum* court recognized, it is possible, depending upon specific circumstances, that there might be more than one reasonable decision available to a fiduciary.  So long as the trustee's decision is one that is reasonable under the circumstances, it is objectively prudent.  *Id.*  Accordingly, there can be no damages where another fiduciary would have made the same decision.

Here, expert Richard May concluded not only that FMV's valuation report was proper, he concluded that the FMV appraisal report was actually *more conservative* (i.e., reflected a lower value for Sierra) than it may have been, supporting a conclusion that GreatBanc's actions were objectively prudent.

## IV.   KEY LEGAL ISSUES AS TO DEFENDANTS' AFFIRMATIVE DEFENSE

### A.   Statute of Limitations

The statute of limitations for a claim of breach of fiduciary duty is (1) six years after (a) the date of the last act which constituted a part of the breach, or (b) in the case of an omission, the latest date on which the fiduciary could have cured the breach; or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach. ERISA §413 (29 U.S.C. §1113).  To acquire actual knowledge, "it is not necessary for a potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its illegality." *Tibble v. Edison Int'l,* 2013 U.S. App. LEXIS 16050, *12 (9th Cir.  (*Ziegler v. Connecticut General Life Ins. Co.,* 916 F.2d 548, 552 (9th Cir. 1990).

The transaction at issue in this case closed on June 20, 2006.  The parties entered into a tolling agreement which tolled the statute of limitations as of May 12, 2012 through September 30, 2012.  Although the Department of Labor claims that the investigation was not opened until August 2009, GreatBanc cannot confirm this as the Department has refused to produce documents relating to the investigation, asserting "Investigative File" and "Deliberative Process" privileges.  However, Tiffany Woo, the Department of Labor's investigator on the case, testified at her deposition that the investigation was commenced based upon information contained in the Annual Report Form 5500 for the plan year ending March 31, 2007 which was filed with the Department of Labor on February 26, 2008, more than three years before May 12, 2012 and the folling agreement provides that if the statutes of limitations had expired prior to May 12, 2012, the tolling agreement does not extend the statute of limitations.

### B.   Failure to State a Claim

For all of the reasons set forth in Section III, above, GreatBanc believes that Plaintiff has failed to state any actionable claim against it.

1
2
**V.     ANTICIPATED EVIDENTIARY ISSUES**
3
    GreatBanc reserves the right to challenge the qualifications of Plaintiff's
4
expert and to seek an order in limine barring his trial testimony.
5
6
**VI.    BIFURCATION OF ISSUES**
7
    GreatBanc does not seek bifurcation of any issues for purposes of trial.
8
9
**VII.  JURY TRIAL**
10
    Jury trials are not permitted under ERISA.
11
12
13
Dated:      October 28, 2013        DRINKER BIDDLE & REATH LLP
14
                                    By    /s/ Joseph C. Faucher
15
                                    *Attorneys for Defendant GreatBanc Trust*
16                                  *Company*
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 28, 2013, GreatBanc Trust Company's Memorandum of Contentions of Fact and Law was filed electronically.  Notice of this filing will be sent to all parties listed below by operation of the Court's electronic system.  Parties may access this filing through the Court's system.

Daniel J. Chasek
U.S. Department of Labor – Office of the Solicitor
World Trade Center
350 S. Figueroa Street, Suite 370
Los Angeles, CA 90071-1201
chasek.daniel@dol.gov
       Attorney for Plaintiff

Jeffrey M. Hahn
Syma Ahmad
David Ellis
U.S. Department of Labor – Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, DC 20013
Hahn.Jeffrey.M@dol.gov
ahmad.syma@dol.gov
ellis.david@dol.gov
       Attorney for Plaintiff

By: ____ */s/Julie A. Govreau*

CH01/ 26262220.1