# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THOMAS E. PEREZ**, Secretary of the United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>**GREATBANC TRUST COMPANY,** et al.,<br><br>Defendants. | ) Case No. ED-CV12-1648-R(DTBx)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **SETTLEMENT AGREEMENT**<br>)<br>)<br>)<br>)<br>)<br>) |

This SETTLEMENT AGREEMENT ("Settlement Agreement") is entered into by and between Thomas E. Perez, Secretary of the United States Department of Labor ("Secretary"), acting in his official capacity, by and through his duly authorized representatives, and GreatBanc Trust Company ("GreatBanc"), by and through its duly authorized representative (individually, a "party" and collectively, the "parties"), to settle all civil claims and issues between them.

WHEREAS, the Secretary's predecessor, Hilda L. Solis, acting in her official capacity, pursuant to her authority under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., as amended, filed this action in connection with the June 20, 2006 purchase of Sierra Aluminum Company ("Sierra") stock by the Employee Stock Ownership Plan sponsored by Sierra (the "Sierra ESOP"), and Thomas

1

E. Perez, current Secretary of the United States Department of Labor, in his official capacity, substituted for Hilda Solis and is now the plaintiff in this action;

WHEREAS, the Secretary and GreatBanc have negotiated this Settlement Agreement through their respective attorneys in a mediation process;

WHEREAS, the Secretary and GreatBanc have engaged in a constructive and collaborative effort to establish binding policies and procedures relating to GreatBanc's fiduciary engagements and to its process of analyzing transactions involving purchases or sales by ERISA-covered employee stock ownership plans ("ESOPs") of employer securities that are not publicly traded. Those policies and procedures, to which the parties have agreed, are set forth in Attachment A hereto, which is incorporated herein as an integral part of this Settlement Agreement (hereinafter collectively, "Settlement Agreement");

WHEREAS, each party acknowledges that its representations are material factors in the other party's decision to enter into this Settlement Agreement;

WHEREAS, the parties agree to settle on the terms and conditions hereafter set forth as a full and complete resolution of all of the civil claims and issues arising between them in this action without trial or adjudication of any issue of fact or law raised in the Secretary's Complaint in this action and other claims and issues as set forth in this Settlement Agreement;

NOW THEREFORE, in consideration of the mutual covenants set forth in this Settlement Agreement and other valuable and sufficient consideration, the parties have agreed to the following terms:

A.      GreatBanc agrees to pay or cause its insurers to pay the total sum of $4,772,727.27 dollars to the Sierra ESOP to settle this case ("Settlement Amount") in accordance with the payment plan set forth below. The Settlement Amount includes resolution of claims that the Secretary may have had with respect to reimbursement of attorneys' fees, costs, and expenses paid by Sierra in connection with the Secretary's investigation and litigation regarding the Sierra ESOP's stock purchase.

B.      GreatBanc agrees to pay or cause its insurers to pay the total sum of $477,272.73 dollars to the U.S. Department of Labor pursuant to ERISA § 502(l), 29 U.S.C. § 1132(l) ("502(l) Payment") in connection with this settlement in accordance with the payment plan set forth below. GreatBanc waives the notice of assessment and service requirement of 29 C.F.R. § 2570.83 for all payments required under this Settlement Agreement. The 502(l) Payments shall be paid via regular mail to the following address:

> U.S. Department of Labor
> ERISA Civil Penalty
> P.O. Box 71360
> Philadelphia, PA 19176-1360

Each check will be made payable to the United States Department of Labor and will reference EBSA Case No. 72-033070 (48).  If GreatBanc wishes to remit a check by commercial express courier, they agree to contact Soroosh Nikouei at the Department of Labor (Nikouei.Soroosh@dol.gov or 202- 693-8486) and follow his instructions.

C.      Within 30 (thirty) days after the Effective Date (as defined in Paragraph S below), GreatBanc agrees to cause its insurers to pay $3,250,000 of the Settlement Amount to the Sierra ESOP.

D.     Within 30 (thirty) days after the Effective Date, GreatBanc agrees to pay $613,636.36 dollars of the Settlement Amount to the Sierra ESOP.

E.     Within 35 (thirty-five) days after the Effective Date, GreatBanc agrees to pay $386,363.64 dollars of the 502(l) Payment in the manner set forth in paragraph B above.

F.     On the date that is one calendar year after the Effective Date, GreatBanc agrees to pay $363,636.36 dollars of the Settlement Amount to the Sierra ESOP and simultaneously agrees to pay $36,363.64 of the 502(l) Payment in the manner set forth in paragraph B above.

G.     On the date that is two calendar years after the Effective Date, GreatBanc agrees to pay $363,636.36 dollars of the Settlement Amount to the Sierra ESOP and simultaneously agrees to pay $36,363.64 of the 502(l) Payment in the manner set forth in paragraph B above.

H.     On the date that is three calendar years after the Effective Date, GreatBanc agrees to pay $181,818.18 dollars of the Settlement Amount to the Sierra ESOP and simultaneously agrees to pay $18,181.82 of the 502(l) Payment in the manner set forth in paragraph B above.

I.     GreatBanc agrees to provide to the Secretary proof of payment of the Settlement Amount and proof of the Sierra ESOP's receipt of the Settlement Amount within 10 (ten) days of making each such payment, and proof of payment of the 502(l) Payment within five (5) days of making each such payment.  Such proof will include wire transfer confirmations of the payments and such other proof as may be requested by the Secretary.  Any proof provided under this paragraph will be sent to the Secretary's representatives at the following addresses:

Crisanta Johnson, Regional Director<br/>Los Angeles Regional Office

Employee Benefits Security Administration
U.S. Department of Labor
1055 E. Colorado Blvd., Suite 200
Pasadena, CA  91106

William Scott, Acting Associate Solicitor
Risa Sandler, Counsel for Fiduciary Litigation
Plan Benefits Security Division
Office of the Solicitor
U.S. Department of Labor
P.O. Box 1914
Washington, D.C. 20013

J.      GreatBanc agrees to begin to implement the policies and procedures in Attachment A of this Settlement Agreement immediately after the Effective Date of the Settlement Agreement and in any event, will implement them within no later than ninety (90) days after the Effective Date of the Settlement Agreement.

K.      This Settlement Agreement provides full, final, and complete judicial resolution of all of the civil claims alleged or that could have been alleged in the Secretary's Complaint in this action against GreatBanc relating to the June 20, 2006 purchase of Sierra stock by the Sierra ESOP, and all such claims are hereby settled and released.

L.      The Secretary and his agents, representatives, assigns, predecessors and successors in interest, acting in their official capacities, do hereby waive, release, and forever discharge any and all claims, demands, actions, causes of action, liabilities, or fines (including any payment under Section 502(l) of ERISA), and investigations of whatever nature, that they may have against GreatBanc and its officers, directors, attorneys, employees, predecessors and successors in interest, relating to any ESOP stock

5

transactions that closed prior to the Effective Date, and all such claims are hereby released and settled.

M.     GreatBanc and its agents, representatives, assigns, predecessors and successors in interest, do hereby waive, release and forever discharge any and all claims, demands, actions, causes of action, and liabilities of whatever nature, that they may have against the Secretary and his officers, agents, attorneys, employees, and representatives, both in their individual and governmental capacities, including those arising under the Equal Access to Justice Act or any statute, rule or regulation, that relate in any manner to the investigation, filing, prosecution, and maintenance of this action, and any other proceeding.

N.     With respect to the claims, actions and causes of action being released in this Settlement Agreement, the Parties intend this Settlement Agreement to serve as a general release, notwithstanding whether the Parties, or either of them, have learned of all of the facts upon which those claims, actions or causes of action are based. In that regard, the Parties knowingly waive and relinquish the provisions of California Civil Code Section 1542 which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

O.     Except as set forth in paragraphs K and L above, nothing in this Settlement Agreement limits or affects the Secretary's investigative authority under Title I of ERISA in any way, resolves any claims that have been or may be asserted against GreatBanc by any other ERISA-covered plan or by any other person, or supersedes or negates in any way any other settlement agreements between GreatBanc and the Secretary.

P.     The Secretary shall bear his own costs, expenses, and attorneys' fees in connection with this action and this Settlement Agreement.  The Secretary acknowledges that Sierra and GreatBanc have an indemnification agreement pursuant to which Sierra may have paid or may pay GreatBanc's attorneys' fees, costs, and expenses incurred in connection with this action and the underlying investigation.  GreatBanc agrees not to seek or accept indemnification from Sierra or use any assets of Sierra or the Sierra ESOP for any payments made or required to be made pursuant to this Settlement Agreement, or for any expenses, including attorney's fees, associated with the negotiation, consideration, documentation, or implementation of this Settlement Agreement incurred after May 20, 2014.

Q.     The parties agree that should any issues arise relating to compliance with the monetary terms of this Settlement Agreement, as a precondition to seeking the Court's involvement, the party asserting the issue(s) will provide written notice of the issue(s) to the other party and will use reasonable efforts to resolve them informally.  If the issues cannot be resolved within 90 (ninety) days of the date of the written notice, the parties have the option of seeking resolution by more formal means, including through mediation.  Failure by any party to seek enforcement of any provision of this Settlement Agreement shall not be construed as a waiver of such enforcement with regard to that provision or any other provision.

R.     By entering into this Settlement Agreement, the parties hereto represent that each has been informed by counsel of the effect and purpose of this Settlement Agreement and agree to be bound by its terms.  Each person signing this Settlement Agreement on behalf of a party represents that he or she is expressly authorized and empowered to execute this Settlement Agreement on behalf of that party.  This Settlement Agreement is binding on

the Employee Benefits Security Administration of the United States Department of Labor and not on any other government agency.

S.     This Settlement Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same instrument.  Delivery of an executed signature page of this Settlement Agreement by facsimile transmission or an electronic image by email transmission shall be as effective as a manually executed counterpart.

T.     The parties agree to seek an Order of the Court in this action incorporating all terms of this Settlement Agreement, dismissing this action with prejudice and without costs, and retaining jurisdiction for the purpose of enforcing the monetary terms of the Settlement Agreement.  This Settlement Agreement is null and void unless such an Order is signed and entered by the Court.  The Effective Date of this Settlement Agreement is the date on which the Court enters such an Order.

U.     This Agreement may only be amended or modified in a writing signed by a duly authorized representative of both of the Parties.

IN WITNESS WHEREOF. The parties through their respective duly authorized representatives have executed this Settlement Agreement on the date(s) set forth hereunder.

FOR THE SECRETARY:

M. PATRICIA SMITH
Solicitor of Labor

G. WILLIAM SCOTT
Acting Associate Solicitor
Plan Benefits Security Division

8

RISA D. SANDLER
Counsel for Fiduciary Litigation

ROBERT L. FURST
Senior Trial Attorney

_Syma Ahmad_____   Dated: _6/2/2014_
SYMA AHMAD
JEFFREY M. HAHN
DAVID M. ELLIS
Attorneys for Plaintiff


FOR GREATBANC TRUST COMPANY:


By:_____   Dated:_____

Its_____

9

1

2  RISA D. SANDLER
   Counsel for Fiduciary Litigation
3

4  ROBERT L. FURST
   Senior Trial Attorney
5

6  _____   Dated:_____

7  SYMA AHMAD

8  JEFFREY M. HAHN

9  DAVID M. ELLIS
   Attorneys for Plaintiff
10

11

   FOR GREATBANC TRUST COMPANY:
12

13

14 By:_____   Dated: 6/1/2014

15 Its_____

16

17

18

19

20

21

22

23

24

25

26

27

28

9

**ATTACHMENT A**

AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND
PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS

The Secretary of the United States Department of Labor (the "Secretary") and GreatBanc Trust Company ("the Trustee"), by and through their attorneys, have agreed that the policies and procedures described below apply whenever the Trustee serves as a trustee or other fiduciary of any employee stock ownership plan subject to Title I of ERISA ("ESOP") in connection with transactions in which the ESOP is purchasing or selling, is contemplating purchasing or selling, or receives an offer to purchase or sell, employer securities that are not publicly traded.

A.     Selection and Use of Valuation Advisor – General.  In all transactions involving the purchase or sale of employer securities that are not publicly traded, the Trustee will hire a qualified valuation advisor, and will do the following:

1.  prudently investigate the valuation advisor's qualifications;

2.  take reasonable steps to determine that the valuation advisor receives complete, accurate and current information necessary to value the employer securities; and

3.  prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice.

B.     Selection of Valuation Advisor – Conflicts of Interest. The Trustee will not use a valuation advisor for a transaction that has previously performed work – including but not limited to a "preliminary valuation" – for or on behalf of the ESOP sponsor (as distinguished from the ESOP), any counterparty to the ESOP involved in the transaction, or any other entity that is structuring the transaction (such as an investment bank) for any party other than the ESOP or its trustee.  The Trustee will not use a valuation advisor for a transaction that has a familial or corporate relationship (such as a parent-subsidiary relationship) to any of the aforementioned persons or entities.  The Trustee will obtain written confirmation from the valuation advisor selected that none of the above-referenced relations exist.

C.     Selection of Valuation Advisor – Process.  In selecting a valuation advisor for a transaction involving the purchase or sale of employer securities, the Trustee will prepare a written analysis addressing the following topics:

1. The reason for selecting the particular valuation advisor;

2. A list of all the valuation advisors that the Trustee considered;

3. A discussion of the qualifications of the valuation advisors that the Trustee considered;

4. A list of references checked and discussion of the references' views on the valuation advisors;

5. Whether the valuation advisor was the subject of prior criminal or civil proceedings; and

6. A full explanation of the bases for concluding that the Trustee's selection of the valuation advisor was prudent.

If the Trustee selects a valuation advisor from a roster of valuation advisors that it has previously used, the Trustee need not undertake anew the analysis outlined above if the following conditions are satisfied: (a) the Trustee previously performed the analysis in connection with a prior engagement of the valuation advisor; (b) the previous analysis was completed within the 15 month period immediately preceding the valuation advisor's selection for a specific transaction; (c) the Trustee documents in writing that it previously performed the analysis, the date(s) on which the Trustee performed the analysis, and the results of the analysis; and (d) the valuation advisor certifies that the information it previously provided pursuant to item (5) above is still accurate.

    D.    <u>Oversight of Valuation Advisor – Required Analysis</u>.  In connection with any purchase or sale of employer securities that are not publicly traded, the Trustee will request that the valuation advisor document the following items in its valuation report,[1] and if the valuation advisor does not so document properly, the Trustee will prepare supplemental documentation of the following items to the extent they were not documented by the valuation advisor:

---

[1] As used herein, "valuation report" means the final valuation report as opposed to previous versions or drafts.

1. Identify in writing the individuals responsible for providing any projections reflected in the valuation report, and as to those individuals, conduct reasonable inquiry as to: (a) whether those individuals have or reasonably may be determined to have any conflicts of interest in regard to the ESOP (including but not limited to any interest in the purchase or sale of the employer securities being considered); (b) whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts: and (c) record in writing how the Trustee and the valuation advisor considered such conflicts in determining the value of employer securities;

2. Document in writing an opinion as to the reasonableness of any projections considered in connection with the proposed transaction and explain in writing why and to what extent the projections are or are not reasonable.  At a minimum, the analysis shall consider how the projections compare to, and whether they are reasonable in light of, the company's five-year historical averages and/or medians and the five-year historical averages and/or medians of a group of comparable public companies (if any exist) for the following metrics, unless five-year data are unavailable (in which case, the analyses shall use averages extending as far back as possible):

   a. Return on assets

   b. Return on equity

   c. EBIT margins

   d. EBITDA margins

   e. Ratio of capital expenditures to sales

   f.  Revenue growth rate

   g. Ratio of free cash flows (of the enterprise) to sales

3. If it is determined that any of these metrics should be disregarded in assessing the reasonableness of the projections, document in writing both the calculations of the metric (unless calculation is impossible) and the basis for the conclusion that the

metric should be disregarded. The use of additional metrics to evaluate the reasonableness of projections other than those listed in section D(2)(a)-(g) above is not precluded as long as the appropriateness of those metrics is documented in writing. If comparable companies are used for any part of a valuation – whether as part of a Guideline Public Company method, to gauge the reasonableness of projections, or for any other purpose – explain in writing the bases for concluding that the comparable companies are actually comparable to the company being valued, including on the basis of size, customer concentration (if such information is publicly available), and volatility of earnings.  If a Guideline Public Company analysis is performed, explain in writing any discounts applied to the multiples selected, and if no discount is applied to any given multiple, explain in significant detail the reasons.

4. If the company is projected to meet or exceed its historical performance or the historical performance of the group of comparable public companies on any of the metrics described in paragraph D(2) above, document in writing all material assumptions supporting such projections and why those assumptions are reasonable.

5. To the extent that the Trustee or its valuation advisor considers any of the projections provided by the ESOP sponsor to be unreasonable, document in writing any adjustments made to the projections.

6. If adjustments are applied to the company's historical or projected financial metrics in a valuation analysis, determine and explain in writing why such adjustments are reasonable.

7. If greater weight is assigned to some valuation methods than to others, explain in writing the weighting assigned to each valuation method and the basis for the weightings assigned.

8. Consider, as appropriate, how the plan document provisions regarding stock distributions, the duration of the ESOP loan, and the age and tenure of the ESOP participants, may affect the ESOP sponsor's prospective repurchase obligation, the prudence of the stock purchase, or the fair market value of the stock.

9.  Analyze and document in writing (a) whether the ESOP sponsor will be able to service the debt taken on in connection with the transaction (including the ability to service the debt  in the event that the ESOP sponsor fails to meet the projections relied upon in valuing the stock); (b) whether the transaction is fair to the ESOP from a financial point of view; (c) whether the transaction is fair to the ESOP relative to all the other parties to the proposed transaction; (d) whether the terms of the financing of the proposed transaction are market-based, commercially reasonable, and in the best interests of the ESOP; and (e) the financial impact of the proposed transaction on the ESOP sponsor, and document in writing the factors considered in such analysis and conclusions drawn therefrom.

E.      Financial Statements.

1.  The Trustee will request that the company provide the Trustee and its valuation advisor with audited unqualified financial statements prepared by a CPA for the preceding five fiscal years, unless financial statements extending back five years are unavailable (in which case, the Trustee will request audited unqualified financial statement extending as far back as possible).

2.  If the ESOP Sponsor provides to the Trustee or its valuation advisor unaudited or qualified financial statements prepared by a CPA for any of the preceding five fiscal years (including interim financial statements that update or supplement the last available audited statements), the Trustee will determine whether it is prudent to rely on the unaudited or qualified financial statements notwithstanding the risk posed by using unaudited or qualified financial statements.

3.  If the Trustee proceeds with the transaction notwithstanding the lack of audited unqualified financial statements prepared by a CPA (including interim financial statements that update or supplement the last available audited statements), the Trustee will document the bases for the Trustee's reasonable belief that it is prudent to rely on the financial statements, and explain in writing how it accounted for any risk posed by using qualified or unaudited statements.  If the Trustee does not believe that it can reasonably

conclude that it would be prudent to rely on the financial statements used in the valuation report, the Trustee will not proceed with the transaction.  While the Trustee need not audit the financial statements itself, it must carefully consider the reliability of those statements in the manner set forth herein.

F.  <u>Fiduciary Review Process – General</u>.  In connection with any transaction involving the purchase or sale of employer securities that are not publicly traded, the Trustee agrees to do the following:

1.  Take reasonable steps necessary to determine the prudence of relying on the ESOP sponsor's financial statements provided to the valuation advisor, as set out more fully in paragraph E above;

2.  Critically assess the reasonableness of any projections (particularly management projections), and if the valuation report does not document in writing the reasonableness of such projections to the Trustee's satisfaction, the Trustee will prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

3.  Document in writing its bases for concluding that the information supplied to the valuation advisor, whether directly from the ESOP sponsor or otherwise, was current, complete, and accurate.

G.  <u>Fiduciary Review Process – Documentation of Valuation Analysis</u>.  The Trustee will document in writing its analysis of any final valuation report relating to a transaction involving the purchase or sale of employer securities.  The Trustee's documentation will specifically address each of the following topics and will include the Trustee's conclusions regarding the final valuation report's treatment of each topic and explain in writing the bases for its conclusions:

1.  Marketability discounts;

2.  Minority interests and control premiums;

3.  Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming

that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

4. Analysis of the company's strengths and weaknesses, which may include, as appropriate, personnel, plant and equipment, capacity, research and development, marketing strategy, business planning, financial condition, and any other factors that reasonably could be expected to affect future performance;

5. Specific discount rates chosen, including whether any Weighted Average Cost of Capital used by the valuation advisor was based on the company's actual capital structure or that of the relevant industry and why the chosen capital structure weighting was reasonable;

6. All adjustments to the company's historical financial statements;

7. Consistency of the general economic and industry-specific narrative in the valuation report with the quantitative aspects of the valuation report;

8. Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

9. The comparability of the companies chosen as part of any analysis based on comparable companies;

10. Material assumptions underlying the valuation report and any testing and analyses of these assumptions;

11. Where the valuation report made choices between averages, medians, and outliers (e.g., in determining the multiple(s) used under the "guideline company method" of valuation), the reasons for the choices;

12. Treatment of corporate debt;

13. Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies;

14. The ESOP sponsor's ability to service any debt or liabilities to be taken on in connection with the proposed transaction;

15. The proposed transaction's reasonably foreseeable risks as of the date of the transaction;

16. Any other material considerations or variables that could have a significant effect on the price of the employer securities.

H.      <u>Fiduciary Review Process – Reliance on Valuation Report</u>.

1. The Trustee, through its personnel who are responsible for the proposed transaction, will do the following, and document in writing its work with respect to each:

   a.  Read and understand the valuation report;

   b.  Identify and question the valuation report's underlying assumptions;

   c.  Make reasonable inquiry as to whether the information in the valuation report is materially consistent with  information in the Trustee's possession;

   d.  Analyze whether the valuation report's conclusions are consistent with the data and analyses; and

   e.  Analyze whether the valuation report is internally consistent in material aspects.

2. The Trustee will document in writing the following:  (a) the identities of its personnel who were primarily responsible for the proposed transaction, including any person who participated in decisions on whether to proceed with the transaction or the price of the transaction; (b) any material points as to which such personnel disagreed and why; and (c) whether any such personnel concluded or expressed the belief prior to the Trustee's approval of the transaction that the valuation report's conclusions were inconsistent with the data and analysis therein or that the valuation report was internally inconsistent in material aspects.

3. If the individuals responsible for performing the analysis believe that the valuation report's conclusions are not consistent with the data and analysis or that the valuation report is internally inconsistent in material respects, the Trustee will not proceed with the transaction.

I.       Preservation of Documents.  In connection with any transaction completed by the Trustee through its committee or otherwise, the Trustee will create and preserve, for at least six (6) years, notes and records that document in writing the following:

1.    The full name, business address, telephone number and email address at the time of the Trustee's consideration of the proposed transaction of  each member of the Trustee's Fiduciary Committee (whether or not he or she voted on the transaction) and any other Trustee personnel who made any material decision(s) on behalf of the Trustee in connection with the proposed transaction, including any of the persons identified pursuant to H(2) above;

2.    The vote (yes or no) of each member of the Trustee's Fiduciary Committee who voted  on the proposed transaction and a signed certification by each of the voting committee members and any other Trustee personnel who made any material decision(s) on behalf of the Trustee in connection with the proposed transaction that they have read the valuation report, identified its underlying assumptions, and considered the reasonableness of the valuation report's assumptions and conclusions;

3.    All notes and records created by the Trustee in connection with its consideration of the proposed transaction, including all documentation required by this Agreement;

4.    All documents the Trustee and the persons identified in 1 above relied on in making their decisions;

5.    All electronic or other written communications the Trustee and the persons identified in 1 above had with service providers (including any valuation advisor), the ESOP sponsor, any non-ESOP counterparties, and any advisors retained by the ESOP sponsor or non-ESOP counterparties.

J.       Fair Market Value.  The Trustee will not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value.  The DOL states that the principal amount of the debt financing the transaction, irrespective of the interest rate, cannot exceed the securities' fair market value.  Accordingly, the Trustee will not cause an ESOP to engage in a leveraged stock purchase transaction in which the

principal amount of the debt financing the transaction exceeds the fair market value of the stock acquired with that debt, irrespective of the interest rate or other terms of the debt used to finance the transaction.

      K.    <u>Consideration of Claw-Back</u>.  In evaluating proposed stock transactions, the Trustee will consider whether it is appropriate to request a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances.  The Trustee will document in writing its consideration of the appropriateness of a claw-back or other purchase price adjustment(s).

      L.    <u>Other Professionals</u>. The Trustee may, consistent with its fiduciary responsibilities under ERISA, employ, or delegate fiduciary authority to, qualified professionals to aid the Trustee in the exercise of its powers, duties, and responsibilities as long as it is prudent to do so.

      M.    This Agreement is not intended to specify all of the Trustee's obligations as an ERISA fiduciary with respect to the purchase or sale of employer stock under ERISA, and in no way supersedes any of the Trustee's obligations under ERISA or its implementing regulations.

IN WITNESS WHEREOF, the Secretary and GreatBanc have executed this Agreement in duplicate originals on the dates indicated by their respective signatures.

FOR THE SECRETARY:              FOR GREATBANC TRUST COMPANY:

PATRICIA SMITH                  By:_____  Date:_____
Solicitor of Labor
                                Title:_____

G. WILLIAM SCOTT
Acting Associate Solicitor
Plan Benefits Security Division

RISA D. SANDLER
Counsel for Fiduciary Litigation

ROBERT L. FURST
Senior Trial Attorney

_____  Date:  6/2/2014
SYMA AHMAD
JEFFREY M. HAHN
DAVID M. ELLIS
Attorneys for Plaintiff

Page 11 of 11

IN WITNESS WHEREOF, the Secretary and GreatBanc have executed this Agreement in duplicate originals on the dates indicated by their respective signatures.

FOR THE SECRETARY:                    FOR GREATBANC TRUST COMPANY:

                                      By: _____  Date: 6/1/2014

PATRICIA SMITH                        Title: _Chairman_____
Solicitor of Labor

G. WILLIAM SCOTT
Acting Associate Solicitor
Plan Benefits Security Division

RISA D. SANDLER
Counsel for Fiduciary Litigation

ROBERT L. FURST
Senior Trial Attorney


_____ Date: _____

SYMA AHMAD
JEFFREY M. HAHN
DAVID M. ELLIS
Attorneys for Plaintiff


Page 11 of 11